UNITED STATES DISTRICT COURT
FOR THE NEW HAMPSHIRE DISTRICT

| | |
|---|---|
| Coronavirus Reporter<br><br>              Plaintiff,<br><br>vs.<br><br>Apple Inc.<br>              Defendant. | Case  CV-2021-<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br><br>DEMAND FOR JURY TRIAL |

## PLAINTIFF'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## I.   INTRODUCTION

1. In February 2020, the Plaintiff formed an ad hoc group of health care and Dartmouth computer science experts to develop a smartphone application named "Coronavirus Reporter." The COVID-19 pandemic was named on February 11, 2020. The first death in France on February 14 was followed by an outbreak in Italy, and the United States reported its first death on February 29. The Coronavirus Reporter app was completed on March 3, 2020, at which time there was not a single Coronavirus app on the Apple iOS App Store. While some debate existed, most of the United States population, government scientists, and healthcare experts did not predict the rapid extent to which COVID would spread nationally and globally. Within a month, the United States led the world in confirmed cases, social distancing became a familiar term, and millions lost their jobs.

2. The Coronavirus Reporter application ("the app") was developed to capture and obtain critical biostatistical and epidemiological data as it happened. For the first time in the history of pandemics, social media could provide new insights of an entire population that simply could not be obtained from traditional doctor office visits and other screening methods. The app's operation was a simple and familiar "geolocation" map where users would self-identify disease symptoms such as cough, fever, or other yet to be discovered symptoms.

3. In response to the emerging crisis, on March 3, the same day the app was complete, Apple announced that applications dealing with coronavirus would only be allowed from "recognized institutions such as government, hospital, insurance company, NGO, or a university." Plaintiff's app was rejected on these grounds. On appeal, Plaintiff requested

that Apple expand the rule to allow corporations other than insurance companies, such as biotechnology or bioinformatics firms. Apple agreed, and added health care corporations to the list of permissible entities. Apple was then provided with supporting and sponsorship documentation from Coronavirus Reporter's Chief Medical Officer, a former Chief Physician at NASA during the Space Race, and the former President of multiple world-renowned academic medical centers.

4. After a very long twenty days of waiting, Apple informed Plaintiff that the Coronavirus Reporter app would not be permitted on the App Store. Apple alleged that Coronavirus Reporter was not a recognized healthcare company. Additionally, Apple stated that the "user-generated data has not been vetted for accuracy by a reputable source." In other words, Apple told Plaintiff a self-reported symptoms model was not acceptable for the pandemic.

5. About one month after rejecting Plaintiff's app, Apple permitted several employees at a London teaching hospital  to distribute a COVID app on the App Store that functioned nearly identically to Coronavirus Reporter. That competing app obtained the so-called first player advantage, and is used by five million individuals daily.

6. In the following months, Apple formed a partnership with Google and several other universities to create a contact-tracing COVID app. After much delay, the contact-tracing App launched in Summer 2020. Although contact-tracing has worked in some limited scope, much resistance in this country exists. The Apple contact-tracing app generally underperformed expectations and failed to obtain a user base in the United States.

7.  The Sherman Act prohibits monopolization of any part of the trade or commerce among several States, or with foreign nations. Likewise, the Sherman Act prohibits every contract or conspiracy in restraint of trade among several States, or with foreign nations.

8.  The internet was developed by DARPA, a research and development division of the United States Department of Defense. ARPANET was the first packet switched distributed TCP/IP network, the backbone foundation of what we today call the internet. This military research endeavor aimed to provide resilient data transmission infrastructure linking persons around the country and the globe. Considerable taxpayer dollars funded DARPA, and continue to fund urban and rural infrastructure rollout of TCP/IP (internet) data services through fiber optics, wireless spectrum allocations, and other ongoing network infrastructure deployments.

9.  The COVID pandemic serves as a prime example of how ARPANET and its subsequent implementations is particularly well-suited for communication during a national emergency.

10. As ARPANET and the internet developed over time, many of its characteristic distributed networking features have become compromised by the growth of corporate entities that control vast access points. Of particular concern is that unfettered growth of a monopolistic trust, as defined by the Sherman Act, could seriously restrict interstate commerce, and the free exchange of information. A computer scientist who writes software applications that rely upon a free and open internet may be encumbered, should one of these monopolistic trusts destroy access to the internet's free markets and information exchanges.

11. Defendant Apple Inc. did just that, denying millions of citizens the benefit of communicating in a pandemic emergency using an app designed by a world-renowned physician. Indeed, that physician had particular experience in dealing with novel medical situations as exemplified by the fact that he personally gave astronauts the green light to explore unchartered territory;

12. Nearly 60% of users and 80% of paid internet commerce access the national internet backbone using Apple devices. For many millions of these users, their *de facto* access to the internet relies upon using an iOS device. Consider, for example, children or elderly who have been taught to access the internet using a relative's Apple device and have absolutely no reasonable alternative. As such, Apple operates a *de facto* monopoly for access to the national internet communication backbone.

13. Apple has restricted trade, communication, and free information exchange, all in violation of the Sherman Act, when it disallowed Plaintiff's reasonable application.

## II.    JURISDICTION AND VENUE

12. Venue in the New Hampshire District is proper under 15 U.S.C. § 22, which states that any suit proceeding under antitrust laws against a corporation may be brought in any district where it transacts business. Apple transacts business in New Hampshire. Additionally, some officers of the Plaintiff corporation reside in New Hampshire and did not personally waive venue via the Apple Developer Agreement. It is also alleged that the venue waiver is a monopolistic contract that is forced upon any developer who wishes to make applications that access the national internet backbone, and is itself a violation of the Sherman Act. Furthermore, it is alleged that Apple would have an unfair advantage if

all antitrust actions had to be litigated in the Northern California district, where Apple employs tens of thousands of individuals.

13. Jurisdiction in this Court for a permanent injunction arises under 28 U.S.C. § 1331, for federal questions presented pursuant to 15 U.S.C. § 26 (Clayton Antitrust Act). Diversity jurisdiction is invoked pursuant to 28 U.S.C. § 1332 because the parties reside in different districts and the amount in controversy exceeds $75,000.

## III.    PARTIES

14. Plaintiff's Coronavirus Reporter is a Wyoming Corporation with officers based in New Hampshire, Vermont, and Upstate NY. Coronavirus Reporter is also the name of the Plaintiff's iOS application, which uses the national internet background to allow citizens to self-report and geolocate emerging pandemic trends. Plaintiff's corporation previously transacted business under the name Calid. Plaintiff asserts standing as both a corporation, and additionally as the collective individual persons comprising the corporation, who have no contractual relationship with the Defendant and never signed the Apple Developer Agreeement.

15. Defendant Apple Inc. is a California corporation with its principal place of business in Cupertino. Apple is the largest public company in the world, with a current market capitalization of approximately $2 trillion. Apple designs, markets, and sells smartphones (the iPhone) and computers (the Mac), which functionally rely upon and profit immensely from access to the taxpayer-funded national internet backbone. Apple owns and operates the App Store, which serves as a distribution gateway to the national internet backbone for third-party developers. Pending related litigation against Apple by Epic Inc. alleges that Apple violates antitrust law by disallowing competing app stores

designed by third parties. Notably, this lawsuit does not seek any additional "app stores," rather an injunction preventing  the Apple App Store from disallowing applications of reasonable intention, of adequately functionality, and of legal subject matter . In other words, the Apple App Store violates antitrust law by disallowing third-party applications using arbitrary and capricious standards meant to camouflage Apple's own self-interest and growth of their monopolistic trust.

## IV.     FACTUAL HISTORY

16. Introductory paragraphs preceding this paragraph are asserted herein and responsive pleading is hereby noticed as necessary.

17. Apple operates the App Store, and has exclusive control over iOS applications and their ability to access that national internet backbone.

18. The national TCP/IP internet backbone was built, at least in part, using taxpayer dollars for ARPANET.

19. Apple has profited immensely from the existence of the national internet backbone.

20. Without the internet, and the taxpayer dollars that built it, Apple would not enjoy the $2 trillion valuation it has amassed.

21. The Apple smartphone ecosystem is primarily a graphical user interface software (iOS) and hardware configuration, connecting users to the national internet backbone.

22. Apple relies upon third-party applications, such as Coronavirus Reporter, to provide a functionally useful smartphone, the iPhone, to its customers.

23.  Apple initially developed the App Store to serve as a quality control gateway, ensuring apps functioned to a satisfactory standard and didn't contain software bugs or illegal content.

24. Over the years, Apple has taken a more authoritarian approach to the App Store and has rejected and/or disallowed significant numbers of third-party applications.

25. At the time Plaintiff submitted Coronavirus Reporter to the App Store, there were zero coronavirus-specific apps on the App Store. A keyword search for COVID or Coronavirus yielded no results.

26. Plaintiff's nimble team allowed it to create the first COVID app. The team included NASA's former Chief Physician, and a Dartmouth computer scientist who personally developed apps used by half a billion users. In short, Plaintiff possessed the immediate expertise to combine health care epidemiology research with large-scale data operations, which would allow their COVID app to function and be first-to-market.

27. Apple was basically unable to handle Plaintiff's submission; they didn't expect to have a powerful COVID app ready by late February.

28. Apple internal discussions with its own partners, at the time, were already discussing their own proprietary COVID app. Apple was also looking to form partnerships with other leading institutions to develop COVID apps, that would further cement Apple's own monopolistic trust.

29. The Coronavirus Reporter app was developed in February 2020, by an expert team of doctors and computer scientists. Their team, and the application they developed, was a reasonable application, and, most importantly, was ready for deployment when COVID was just arriving in the United States. The Coronavirus Reporter app, had it been allowed, would likely have provided useful bioinformatics data, and provided a medium for free information exchange among United States citizens and COVID patients.

30. The app had a familiar and intuitive geolocation screen to report symptoms and view nearby outbreaks.



31. Little was known about COVID symptoms at the time, and the app was meant to develop with nimbleness and plasticity as situations emerged. In other words, the same skills

Plaintiff employed to have the first COVID app, would allow for many future-improved versions that could advance epidemiological study of the pandemic.



32.

33. The app did not vet user medical information, because the public demanded information that simply wasn't yet available from mainstream medical institutions. In other words, a social media/crowd-sourced app provided a useful adjunct tool.



This app allows for community reporting of symptoms related to the novel coronavirus. The map view allows you to quickly see 'hot zones' of fever & symptom outbreaks reported by other app users. Users may also report school/work closures and self-quarantine status. Your profile report submission allows you to share valuable data with other users and epidemiology researchers to better understand this rapidly emerging health concern. This app is designed to provide public transparency of an evolving pandemic that is currently unavailable from other sources. Specifically, the true infection incidence rate of COVID-19 is unknown as many with mild symptoms are not registered by public authorities and hospitals. Additionally, there are shortages in lab test kits globally; Vice President Pence confirmed today that the United States has such a shortage. The COVID-19 Coronavirus appears to have originated in Wuhan, China in late 2019. Official estimates place the number of infections just short of 100,000 individuals and 5000 fatalities as of



34. Apple rejected Coronavirus Reporter on March 6, 2020, knowing others were in the pipeline but not yet ready. Apple specifically strategized to prevent Plaintiff's app from setting a precedent or amassing a user base, which could jeopardize its own pipeline and/or the first-mover advantage of desirable institutional partners of a monopolistic trust.

35. Apple's App Review Board did not possess anyone with better COVID insight or credentials Plaintiff's Chief Medical Officer, though Apple acted as if they did have some sort of superior knowledge.

36. Plaintiff's Chief Medical Officer created work-product, the app, that could have benefitted millions. Apple used arbitrary and capricious standards to prevent that benefit from being made reality.

37. Apple is a monopoly as defined by the Sherman Antitrust Act.

38. Apple has the ability to, and has in the past, restrained legally permissible, reasonable internet trade.

39. In the weeks following the initial rejection, with knowledge of Plaintiff's correspondence, Apple broadened the App Store requirements for a COVID app from insurance companies to any healthcare company.

40. Plaintiff is and was a bioinformatics development company. Plantiff's Chief Medical Officer was a qualified healthcare officer appropriate for such an entity. Plaintiff had developed other large scale data and bioinformatics applications since 2014 that had served hundreds of millions of individuals.

41. Despite expanding the App Store guidelines to any healthcare company, Defendant Apple denied the appeal and permanently disallowed the app on March 26, 2020.

42. In fact, in June 2020 Apple publicized that, in light of complaints from developers of anti-trust behavior, they would be allowing developers to challenge the App Store rules. Previously, Apple said developers could only challenge the factual findings of an app review, within the rules guidelines. But in fact, Apple had allowed Plaintiff to challenge the rules as it did in March 2020. Nonetheless, the rules change did not benefit Plaintiff, as Apple still found an arbitrary and/or capricious interpretation of the new rules.

43. In short, Apple's "self-policing" of antitrust developer contracts was a sham, for lack of a better word. It had no tangible, real impact on Apple's stronghold of the App Store and free and open internet access. See https://www.theverge.com/2020/6/22/21299814/apple-app-store-policies-ios-bug-fixes-approval-dispute-appeal

44. Defendant Apple stated the reason for denial was that a) Plaintiff was not a recognized healthcare entity, and b) the "user-generated data wasn't vetted by a reputable source."

45. In so doing, Apple was saying that citizens shouldn't be allowed to post on a private application their symptoms of COVID.

46. In so doing, Apple was infringing upon the right of Plaintiff, as well as ordinary citizens and COVID patients to engage in free, unrestricted commerce and information exchange on the internet.

47. Defendant Apple allowed at least two competing COVID apps approximately four to six weeks after Plaintiff's app was ready. This caused Plaintiff to lose the valuable first-mover advantage of an internet app.

48. Apple allowed a similar British app from Guy's St Thomas' hospital to enter the App Store. Although it was sponsored by an institution, the app was primarily the work-product of several individuals, as was the Plaintiff's app. This app quickly achieved

millions of users a day. Had Plaintiff's app been rightfully approved, Plaintiff's app would have received a significant share of the app that went to competitor apps.

49. In a second example of their arbitrary standards, Apple approved a fledgling Florida startup's COVID app. That startup did not have a Chief Medical Officer with the qualifications of Plaintiff's. That startup did not have a large-scale data computer scientist from Dartmouth, as did Plaintiff's, which had written apps that served hundreds of millions users. In other words, there exists no reasonable argument that the Florida startup app should have been permitted access to the internet, when Plaintiff's app was denied.

50. Allowing the aforementioned competing apps, but disallowing Plaintiff's, was arbitrary and capricious restraint of trade.

51. Apple's contact-tracing app was developed in conjunction with Google.

52. Apple and Google, combined, effectively provide internet access to the entire United States population.

53. By disallowing Plaintiff's app and partnering with Google to provide a COVID app that ultimately failed its objectives, Defendant Apple's monopolistic practices caused a permanent loss of valuable epidemiological bioinformatics data. This loss spanned at least a month, the time during which no competing apps existed. Valuable epidemiological data was forever lost during that historic month.

54. Access to the national internet backbone is theoretically possible without using Apple or Google products, such as with a generic Linux web browser.

55. In practicality, many individuals, especially elderly and children, only learn how to access the internet using a friend or relative's Apple device. Additionally, GPS location

data does not typically exist on a generic web browser. As such, economically efficient geolocation of symptoms was only possible using either Apple's smartphone, or Google's.

56. As such, Apple is a *de facto* monopoly of access to the national internet backbone.

57. There exists tens of millions of individuals in the United States who do not know how to access the internet without using an iOS device.

58. These individuals rely upon access to the internet to perform critical commerce activity, engage in protected free speech, and obtain lifesaving medical advice and treatments.

59. A third-party developer such as Plaintiff, seeking to help facilitate those above enumerated activities, is required to sign Apple's Developer Agreement and ask permission from Apple to distribute their application.

60. There was no reasonable grounds for Apple to deny the Coronavirus Reporter app for public distribution.

61. Apple has an App Review Board that decides which apps it will permit on the App Store.

62. The App Review Board has denied substantial numbers of legitimate, reasonable applications, representing thousands of man-years of work and labor, collectively. Plaintiff, the app team individuals, have personally witnessed the inappropriate rejection of four apps representing eight man-years, and asserts claims herein for all illegally restrained app work.  The exact number of man-years illegally wasted by Apple, possibly tens of thousands, will be sought under early FRCP discovery rules.

63. When the App Review Board denies an app, they assign this to a junior staff member who must make the unpleasant call to a developer team to inform them that their team's work of months or years is being denied access to the global internet backbone.

64. These are often unpleasant and difficult conversations that understandably cause distress for both parties. Upon information and belief, Apple's junior App Review Board employees (who are only known to the developers by first names such as "Erica," "Sara," "Lizzy," and so on) suffer considerable psychological distress from spending much of their day repeatedly shooting down the dreams, and years of work, of eager and often talented app developers.

65. In short, Apple has junior App Store employees do their "dirty work" of unreasonably disallowing perfectly legal and legitimate apps that meet all standards and requirements.

66. The apps are, in fact, disallowed to foster Apple's monopolistic goals, rather than to protect the public from low-quality or illegal applications. Upon information and belief, Apple routinely employs cronyism when it allows one developer's app, but disallows similar apps from other developers. This is particularly evident and distressing to the aforementioned junior App Reviewers, who are aware they are misleading and/or lying to the other developers.

67. This well-known issue is one reason Apple is aware that antitrust laws will, at some point, catch up with their practices.

68. On February 22, 2021, Apple's CEO Tim Cook notified Apple Shareholders that antitrust compliance is a future risk to Apple's profits. Included in the memorandum is new language: "The Audit Committee and Board regularly review and discuss with management Apple's antitrust risks. Apple's Antitrust Compliance Officer is responsible for the development, review, and execution of Apple's Antitrust Compliance Program and regularly reports to the Audit Committee. These reports cover, among other matters, the alignment of the program with Apple's potential antitrust risks, and the effectiveness

of the program's design in detecting and preventing antitrust issues and promoting compliance with laws and Apple policies."

69. Discovery will demonstrate that Apple is aware of numerous instances, such as Coronavirus Reporter, where they violated antitrust law by disallowing reasonable use of their devices and App Store, restraining interstate commerce.

70. The Electronic Frontier Foundation (EFF) is a non-profit that endeavors to maintain free computing practices. The EFF has long been concerned that Big Tech would someday prevent important internet applications from being realized. Historically, most internet applications were free and open-sourced, under the MIT/GNU software licensing paradigm. In the past decade, Defendant Apple has drastically changed the free, open internet to one of massive, trust-like corporate profits and control.

71. Plaintiff submits that Apple's aforementioned disallowance of a renowned Physician and Computer Scientist's first-to-market COVID application is precisely just an example of Apple stepping well over the line into full antitrust violation.

72. Upon information and belief, Plaintiff and its attorney have been made aware of no less than half a dozen similar arbitrary app rejections. App developers who recognize this pattern of antitrust behavior have been noticed to contact Plaintiff's attorney for inclusion as a class action.


## V.    CAUSES OF ACTION


### COUNT I
### Sherman Act Section 2

73.  Plaintiff repeats and re-alleges each and every allegation contained herein as if fully stated under this count.

74.  Apple's conduct violates Section 2 of the Sherman Act, which prohibits "monopolization of any part of the trade of commerce among the several States, or with foreign nations. 15 U.S.C. Section 2

75.  The iOS App Store is an antitrust market as defined under antitrust precedent.

76.  Apple unlawfully maintains its monopoly power in the iOS App Store through its unlawful denial of access to Coronavirus Reporter.

77.  Apple serves as a de facto on-ramp to the national internet backbone, and their anticompetitive behavior prevents taxpayers from accessing the internet via apps such as Coronavirus Reporter.

78.  Apple has some reasonable right to quality control and law enforcement via its App Store.

79.  Disallowing a former NASA Chief Physician from offering a COVID bioinformatics app is not a reasonable right Apple has. In fact, time has shown that Apple's contact-tracing app was largely a failure, and the country and taxpayers would have benefitted from increased competition among apps, such as Coronavirus Reporter. There existed no valid reason for Apple to block the Plaintiff's medical application from the public. Apple did not have "superior expertise" or ability to "foretell COVID" even though it acted like it did.

80.  Not only does Apple prevent developers from selling their product to Apple customers through the App Store they control; Apple in conjunction with Google produced their own contact-tracing software shortly after Coronavirus Reporter was disallowed. The

control of a marketplace where Apple even competes calls for increast scrutiny to this alleged violation of the Sherman Act.

81. The public and the taxpayer would have benefitted from the contributions of a NASA physician and a Dartmouth computer scientist trying to assist in the early days of COVID.

82. As the creator of an app with temporarily limited commercial liability, Coronavirus Reporter was harmed by Apple's anti-competitive conduct in a manner that the antitrust laws, and moreover recent COVID laws, were intended to prevent.

83. Apple disallows applications in an arbitrary and capricious manner to benefit their own monopoly and their business and contract partners.

## COUNT II
## Sherman Act Section 1

84. Plaintiff repeats and re-alleges each and every allegation contained herein as if fully stated under this count.

85. Apple's conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade of commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

86. The Apple Developer Agreement and the terms of the App Store Review Guidelines unreasonably restrain competition between Apple users of different states attempting to access the national and global internet backbone.

87. Apple's conduct and unlawful contractual restraints affects a substantial proportion of the population, approximately 60-80% of internet commerce and information exchange.

88. Apple's conduct and ability to arbitrarily determine which applications will or will not be published has substantial anti-competitive effects, including here the full destruction of Plaintiff's work-product.

89. Under Apple's forced contracts and policies, countless independent developers have been injured in the same way described in this lawsuit.

90. The restraint in this case is even more severe than it may appear on face value because this application is only useful if it achieves a critical mass of users. Apple's disallowment prevented Coronavirus Reporter from realizing its full potential on any available marketplace. In other words, non-Apple users would have a product with reduced functionality, because of Apple's antitrust behavior.

91. Apple's conduct caused Plaintiff substantial injury. Competitor apps that were allowed in March 2020 obtained millions of downloads and a top rank in the App Store, demonstrating the strong demand for COVID information applications at that time.

92. Evidence is irrefutable that Apple green-lit an almost identical app, Zoe created by Guy St Thomas and Kings College London, and other later contributors.

93. Ironically, after all of these years Apple forgot it was founded in the garage of two independent inventors, the legendary American entrepreneurs Steve Jobs and Steve Wozniak.  There was no good reason, decades later, for Apple to mandate that only institutions may contribute to the COVID emergency. This defies Apple's own means of creation. The public can choose which app authors they wish to use, and it is more than evident that Plaintiff's app, at a time when no other COVID apps existed, would have been downloaded by millions. Here, Apple unlawfully put its thumb on the scales, destroying any chance that Coronavirus Reporter had to participate in the open and free

information exchange afforded by the internet. To prevent these harms, this Honorable

Court shall permanently enjoin the aforementioned anti-competitive behavior.

WHEREFORE, The Plaintiff respectfully requests that this Honorable Court:

A.  Order damages in excess of $75,000 under the jurisdictional authority of this Court;

B.  Issue a permanent injunction under the Sherman Act restraining Defendant's App Store

from restricting reasonable applications from access to the global internet;

C.  Grant any further relief as may be fair and just.


Respectfully submitted, this   day of January 2021.

/s/ Keith Mathews
Keith Mathews
NH Bar No. 20997
Associated Attorneys of New England
PO Box 278
Manchester, NH 03105
Ph. 603-622-8100
keith@aaone.law