**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| Coronavirus Reporter, | § § § § | |
| *Plaintiff*, | § § | |
| v. | § § § | Civil Action No. 1:21-cv-00047-LM |
| Apple Inc., | § § § | |
| *Defendant*. | § § | |

<u>**DEFENDANT APPLE INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**</u>

**PRELIMINARY STATEMENT**

Apple set out to build the most secure, private, and trusted mobile computing device ever created when it launched the iPhone over thirteen years ago. One critical element of that success has been Apple's dogged focus on ensuring the safety and security of the App Store—a platform for app developers to distribute apps to iOS device users. Apple's commitment to delivering to its users a high-quality and reliable App Store experience took on added significance during the uncertain, early days of the global coronavirus pandemic. The pandemic required Apple to evaluate apps critically to ensure consumers access to safe, credible apps, supported by established medical and scientific institutions. This was all the more important at the beginning of the pandemic, when it was so hard to know what pandemic-related information was reliable and trustworthy, and so much was unknown about the virus itself.

This case is borne of a developer's dissatisfaction with Apple's lawful efforts—both under antitrust law and the contract at issue here—to ensure the App Store was a place where consumers could find trustworthy and reliable coronavirus-related apps. In a grasping attempt to challenge

the lawfulness of Apple's decision to reject Plaintiff's coronavirus app from distribution on the iOS App Store, Plaintiff brings antitrust and contract claims that exhibit a cavalier disregard for the law and facts, and border on the frivolous.  Those claims must be dismissed for several reasons.[1]

*First*, Plaintiff fails to allege a relevant market, which is comprised of both a geographic market and a product market, and is a necessary element of both of its Sherman Act claims.  Plaintiff does not allege a geographic market at all and alleges a product market supported only by a single, conclusory allegation: the "iOS App Store is an antitrust market as defined under antitrust precedent."  Am. Compl. ("AC") ¶ 80.  This is plainly insufficient.

*Second*, the Amended Complaint is predicated entirely on harm to Plaintiff itself, which does not support either of its Sherman Act claims.  Rather, both claims require a plaintiff to plead harm to *competition*.  Plaintiff makes no effort to do so, confirming that Plaintiff's grievances lie far outside the ambit of antitrust law.

*Third*, Plaintiff's Section 1 claim is predicated exclusively on Apple's unilateral conduct.  But Section 1 requires allegations of concerted action, in the form of an agreement, conspiracy, or other conscious commitment to a common scheme among Apple and its competitors to purportedly restrain trade.  Plaintiff alleges no facts whatsoever showing such concerted action, thus dooming its Section 1 claim.  And to the extent Plaintiff's claim is predicated upon its own agreement to Apple's standard form contracts with developers, courts have consistently dismissed Section 1 claims predicated upon agreements like these.

*Fourth*, Plaintiff's Section 2 claim fails because Plaintiff does not allege any facts

---

[1]   Apple's instant motion to dismiss is without prejudice to its motion to change venue.  ECF No. 19.  In the event that this case is transferred to the Northern District of California, Apple reserves the right to file a renewed motion to dismiss under Rule 12(b) of the Federal Rules of Civil Procedure in order to conform to Ninth Circuit law and practice.

sufficient to establish either that Apple has monopoly power in a relevant market or that Apple has engaged in exclusionary conduct.  At bottom, Plaintiff's allegations devolve into a refusal-to-deal claim that runs afoul of well-settled Supreme Court precedent.

*Fifth*, Plaintiff's contract claims fail because Plaintiff cannot identify any contract term in which Apple "promised" that developers like Plaintiff would be permitted to publish COVID-19 apps on the App Store.  Nor does Plaintiff allege that any other provision within the Apple Developer Agreement was breached.  Plaintiff's claim for breach of the implied covenant of good faith and fair dealing fails because it simply restates its breach of contract claim, and because Plaintiff cannot identify a single express term in the Developer Agreement that was frustrated here.

For these reasons, Apple respectfully requests that the Court dismiss Plaintiff's claims.

## BACKGROUND

Recognizing the deadly serious nature of the public-health crisis at hand, Apple took important steps in the early days of the pandemic to make sure its App Store offered users COVID-19 apps from credible and reputable sources.  According to the Amended Complaint,[2] in March 2020, Apple "announced that applications dealing with coronavirus would only be allowed from 'recognized institutions such as government, hospital, insurance company, NGO, or a university.'"  AC ¶ 3.  Later, Apple allegedly expanded the criteria for developers submitting COVID-19 apps to "any healthcare company with deep-rooted credentials."  *Id*. ¶ 32.

Plaintiff is a Wyoming corporation that "previously transacted business under the name Calid."  *Id.* ¶ 14 (p. 7).  Plaintiff entered into agreements with Apple.  *See id*. ¶¶ 62, 94.  One was the Apple Developer Agreement ("Developer Agreement"), which Plaintiff expressly references

---

[2]   Allegations in Plaintiff's Amended Complaint are stated herein solely for purposes of this motion to dismiss. Apple does not admit the truth of any of Plaintiff's allegations.

throughout the Amended Complaint.  *See id.* ¶¶ 12 (p. 6), 14 (p. 7), 46, 62, 91, 101, 110.[3]  The

Developer Agreement governs basic elements of a developer's relationship with Apple, including

use of Apple's products or services.  It governs, for example, a developer's use of Apple's

confidential information and Apple's "sole discretion" to terminate a developer's status as a

"registered Apple Developer."  Ex. A §§ 5, 10.  The Developer Agreement also contains an

integration clause, which states:  "This Agreement constitutes the entire agreement between the

parties with respect to its subject matter and supersedes all prior or contemporaneous

understandings regarding such subject matter."  *Id.* § 19.  It adds:  "No addition to or removal or

modification of any of the provisions of this Agreement will be binding upon Apple unless made

in writing and signed by an authorized representative of Apple."  *Id.*  The Developer Agreement

was last modified on June 8, 2015.  *Id.* at p. 6.[4]

Developers must abide by the App Store Review Guidelines (the "Guidelines").  AC ¶ 91.

The Guidelines set forth the standards Apple applies when exercising its contractual right to review

and select apps for distribution on the App Store, a process known as "app review."  *See id.* ¶ 45.

Plaintiff alleges that, in February 2020, an "*ad hoc* group of health care and computer

science experts" developed an app named Coronavirus Reporter.  *Id.* ¶ 1.  The app allegedly would

have allowed users to "self-identify" potential COVID-19 symptoms.  *Id.* ¶¶ 2, 30.  Plaintiff

allegedly completed its app on March 3, 2020, and submitted it to Apple for review.  *Id.* ¶¶ 1, 3.

---

[3]  Plaintiff has incorporated by reference the Apple Developer Agreement and predicates its breach of contract claim on it.  Therefore, the Court may consider it on this motion to dismiss.  *See Alt. Energy, Inc.* v. *St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33–34 (1st Cir. 2001) (permitting consideration, on motion to dismiss, of settlement agreement that was not appended to or incorporated in complaint because defendant's "alleged liability under the complaint depends directly upon" interpretation of settlement agreement); *Diva's Inc.* v. *City of Bangor*, 411 F.3d 30, 38 (1st Cir. 2005); *Johnson* v. *People's United Bank, N.A.*, 2016 DNH 206, 1 n.2.

[4]  As noted *infra*, Plaintiff also entered into the Apple Developer Program License Agreement ("DPLA") with Apple, but Plaintiff does not mention this agreement in its Amended Complaint nor predicate any claims on it.  Apple provided the Court with a copy of this agreement in support of its motion to transfer.  ECF No. 19-5.

Plaintiff alleges that Apple rejected Plaintiff's app, and denied an appeal of that decision on March 26, 2020, because the app was not from a "recognized institution," Coronavirus Reporter "lacked 'deeply rooted medical credentials,'" and the app's "user-generated data ha[d] not been vetted for accuracy by a reputable source." *Id.* ¶¶ 3, 5, 31, 33, 47.  Plaintiff alleges that Apple later approved a "similar" app from a U.K. hospital and another Florida-based "COVID app." *Id.* ¶¶ 51–52. Apple also allegedly partnered with "Google and several other universities to create a contact-tracing COVID app." *Id.* ¶¶ 7, 54.

Plaintiff concedes "Apple has some reasonable right to quality control and law enforcement via its App Store." *Id.* ¶ 83.  Plaintiff nonetheless claims that, by rejecting Plaintiff's app, Apple violated Sections 1 and 2 of the Sherman Act, breached a contract with Plaintiff, and breached the implied covenant of good faith and fair dealing. *See id.* ¶¶ 79, 90, 110, 116.

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly,* 550 U.S. 544, 570 (2007)).  The Court takes as true only well-pleaded factual allegations.  It must disregard legal conclusions couched as factual allegations and threadbare recitals of the elements of a cause of action. *See Air Sunshine, Inc.* v. *Carl*, 663 F.3d 27, 33 (1st Cir. 2011).  And it may disregard allegations contradicted by documents embraced by the complaint. *See Newman* v. *Lehman Bros. Holdings Inc.*, 901 F.3d 19, 27 (1st Cir. 2018).

**ARGUMENT**

**I.     Plaintiff's Sherman Act antitrust claims must be dismissed for reasons equally applicable to the Section 1 and Section 2 claims.**

**A.     Plaintiff fails to allege a plausible relevant market.**

In order to state a claim under either Section 1 or Section 2 of the Sherman Act, a plaintiff must plead a relevant market.  *See Yagoozon, Inc.* v. *Kids Fly Safe*, No. CA 14-040 ML, 2014 WL 3109797, at *10 (D.R.I. July 8, 2014) (§ 1); *Gilbuilt Homes, Inc.* v. *Cont'l Homes of New England*, 667 F.2d 209, 211 (1st Cir. 1981) (§ 2).  A relevant antitrust market includes both a geographic market and a product market; a plaintiff must allege facts demonstrating both.  *See Tanaka* v. *Univ. of S. California*, 252 F.3d 1059, 1063 (9th Cir. 2001); *Queen City Pizza, Inc.* v. *Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir. 1997); *R & J Tool, Inc.* v. *The Manchester Tool Co.*, 2001 DNH 009, 4–5, 11.

Defining the "relevant market" is the "threshold" for establishing Plaintiff's Section 1 and 2 claims.  *Fed. Trade Comm'n* v. *Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (citing *Ohio* v. *Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018)); *see also Gen. Bus. Sys.* v. *N. Am. Philips Corp.*, 699 F.2d 965, 972 (9th Cir. 1983).  Without that definition, "there is no way to measure [the defendant's] ability to lessen or destroy competition."  *Walker Process Equip., Inc.* v. *Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) (§ 2); *see also Tanaka*, 252 F.3d at 1063 (§ 1).  The First Circuit has affirmed the dismissal of Sherman Act Section 1 *and* Section 2 claims when the plaintiff failed to sufficiently allege a relevant market.  *See E. Food Servs., Inc.* v. *Pontifical Cath. Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 7 (1st Cir. 2004) (§ 1); *Gilbuilt Homes*, 667 F.2d at 211 (§ 2).

**1.     Plaintiff fails to plead a geographic market.**

A complaint must plead a relevant geographic market that encompasses "the geographic area in which the defendant faces competition and to which consumers can practically turn for

alternative sources of the product." *Coastal Fuels of Puerto Rico, Inc.* v. *Caribbean Petroleum Corp.*, 79 F.3d 182, 196 (1st Cir. 1996) (quoting *Baxley–DeLamar* v. *American Cemetery Ass'n*, 938 F.2d 846, 850 (8th Cir.1991)) (reversing § 2 verdict given failure to show monopoly power in a relevant market); *see also Mathias* v. *Daily News, L.P.*, 152 F. Supp. 2d 465, 481 (S.D.N.Y. 2001) ("without a proper delineation" of the "geographic markets, a claim under § 1 or § 2 of the Sherman Act will be dismissed").   Allegations about the "precise geographic boundaries of effective competition" permit a "more informed conclusion on potential harm to the market." *Id.*

The Amended Complaint does not allege a geographic market at all, which alone warrants dismissal of both of Plaintiff's Sherman Act claims.   *See Mathias*, 152 F. Supp. 2d at 483 (dismissing § 1 and § 2 claims because "failure to define a geographic market with precision makes it impossible to assess the potential harm to competition resulting from" defendant's alleged misconduct); *Concord Assocs., L.P.* v. *Ent. Properties Tr.*, No. 12 CIV. 1667 ER, 2014 WL 1396524, at *16–20 (S.D.N.Y. Apr. 9, 2014) (dismissing § 1 and § 2 claims when geographic market was not "appropriately defined"), *aff'd,* 817 F.3d 46 (2d Cir. 2016); *E. Food Servs*, 357 F.3d at 7 (affirming dismissal where plaintiff had failed to allege a plausible geographic market).

### 2.   Plaintiff's one-sentence, conclusory product-market definition is insufficient.

Plaintiff attempts to define the relevant product market in a single sentence: "The iOS App Store is an antitrust market as defined under antitrust precedent."  AC ¶ 80.  This alleged product market fails for two reasons, both of which are independent grounds for dismissing the Sherman Act claims. *See Analogix Semiconductor, Inc.* v. *Silicon Image, Inc.*, No. C 08-2917 JF PVT, 2008 WL 8096149, at *7 (N.D. Cal. Oct. 28, 2008) (dismissing § 1 and § 2 claims for failure to plead a relevant product market).

First, Plaintiff's asserted product market of the iOS App Store is entirely conclusory;

Plaintiff's only allegation is that the iOS App Store is "an antitrust market as defined under antitrust precedent."  AC ¶ 80.  Plaintiff alleges no facts in support of its purported product market.  *See Tanaka*, 252 F.3d at 1063 (dismissing § 1 claim because plaintiff's product market definition was supported by "conclusory assertion" that product was "unique" and "not interchangeable"); *Lee* v. *Life Ins. Co. of N. Am.*, 829 F. Supp. 529, 539–41 (D.R.I. 1993) (factually unsupported allegations regarding product market insufficient to state § 1 or § 2 claim), *aff'd*, 23 F.3d 14 (1st Cir. 1994); *Pistacchio* v. *Apple Inc*., No. 4:20-CV-07034-YGR, 2021 WL 949422, at *2 (N.D. Cal. Mar. 11, 2021) (dismissing §§ 1 and 2 claims where "the relevant market definition contains sparse supporting allegations").  Second, the alleged product market is facially implausible. "Determining the scope of a product market begins with examining the universe of products that are considered 'reasonably interchangeable by consumers for the same purposes.'"  *Flovac, Inc.* v. *Airvac, Inc.*, 817 F.3d 849, 854 (1st Cir. 2016) (quoting *United States* v. *E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)).  "The market is established by examining both the substitutes that a consumer might employ and 'the extent to which consumers will change their consumption of one product in response to a price change in another, i.e., the cross-elasticity of demand.'"  *Id.* (quoting *Eastman Kodak Co.* v. *Image Tech. Servs., Inc.*, 504 U.S. 451, 469 (1992)).  A product market must be properly defined so that it "encompasses the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business."  *Hicks* v. *PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) (internal quotations and citation omitted). In assessing a plaintiff's allegations, the Court may draw upon its "judicial experience and common sense."  *Philips Med. Sys. Puerto Rico, Inc.* v. *Alpha Biomedical & Diagnostic Corp.*, No. 19-1488 (BJM), 2020 WL 7029014, at *1, 7 (D.P.R. Nov. 30, 2020) (quoting *Schatz* v. *Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012)) (rejecting plaintiff's market

definition and dismissing § 2 claim).

Plaintiff makes no effort to define its proffered product market in terms of the rule of reasonable interchangeability.  That failure is fatal, particularly when Plaintiff asserts that a single business's "App Store" for distributing apps (Apple's) is the relevant market but fails to account for obvious and conceded reasonable substitutes, such as other app-distribution or web-based platforms.  *Cf.* AC ¶ 58 (conceding that an app like Plaintiff's could have been developed for distribution on Google smartphones).

Courts overwhelmingly dismiss Sherman Act claims under these circumstances.  *See Queen City Pizza*, 124 F.3d at 436 (where "plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand . . .  the relevant market is legally insufficient and a motion to dismiss may be granted");  *E. & G. Gabriel* v. *Gabriel Bros.*, No. 93 CIV. 0894 (PKL), 1994 WL 369147, at *3 (S.D.N.Y. July 13, 1994) ("Plaintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal."); *Yagoozon*, 2014 WL 3109797, at *11 (rejecting plaintiff's alleged market definition absent "factual allegations of cross-elasticity of demand or other indications of price sensitivity that would indicate whether consumers treat the available options as substitutable"); *Lee*, 829 F. Supp. at 540–41 (dismissing antitrust claims where plaintiff made an "incomprehensible declaration" that "[o]bviously there is nothing reasonably interchangeable" with its proposed product market but failed to allege facts showing why); *Pistacchio*, 2021 WL 949422, at *2 (dismissing §§ 1 and 2 claims where plaintiff was "required, and has not included appropriate allegations demonstrating that there are *not* appropriate economic substitutes"); *Big Bear Lodging Ass'n* v. *Snow Summit, Inc.*, 182 F.3d 1096, 1105 (9th Cir. 1999) (dismissal for failure to allege "there are no other goods or services that are reasonably

interchangeable"); *cf. Day* v. *Nakamura*, 59 F.3d 164, 1995 WL 391961, at *1–2 (1st Cir. June 30, 1995) (rejecting the complaint's "vague and contradictory allegations" and dismissing antitrust claims when plaintiff consumer could have purchased a similar product to defendant's from defendant's competitor). Plaintiff alleges a product market with no effort to allege facts about the universe of products that are considered reasonably interchangeable by consumers for the same purposes and without alleging why the product market is so unique as to have no competitors; these failures require dismissal of its Sherman Act claims.

**B.      Plaintiff fails to plead anticompetitive harm.**

Plaintiff's Section 1 and Section 2 claims require Plaintiff to plead anticompetitive harm. *See TechReserves Inc.* v. *Delta Controls Inc.*, No. 13 CIV. 752 GBD, 2014 WL 1325914, at *3 (S.D.N.Y. Mar. 31, 2014) (to "state a claim under either section of the Sherman Act," a plaintiff must allege "anticompetitive harm that affects the market as a whole"). Harm to competition is also essential to establishing antitrust injury, a requirement of both Section 1 and 2 claims that is independent of the elements of each claim. *See Mathias*, 152 F. Supp. 2d at 478 (explaining that "the antitrust injury requirement exists independently of the elements of an antitrust violation and becomes itself a pleading requirement"). Allegations of anticompetitive harm are critical—even at the pleading stage—because antitrust law is designed to protect competition, not competitors. *See, e.g.*, *Brown Shoe Co.* v. *United States*, 370 U.S. 294, 320 (1962); *Atl. Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328, 338 (1990); *Spectrum Sports, Inc.* v. *McQuillan*, 506 U.S. 447, 458 (1993).

Harm to competition is "usually measured by a reduction in output and an increase in prices in the relevant market." *Sterling Merch., Inc.* v. *Nestle, S.A.*, 656 F.3d 112, 121 (1st Cir. 2011) (internal quotation marks and citation omitted); *see also ABG Prime Grp., LLC* v. *Innovative Salon Prods., LLC*, No. 17-12280, 2018 WL 3474587, at *3 (E.D. Mich. July 19, 2018) ("a 'market-

wide' injury to competition is one that somehow threatens the relevant market's efficiency");

*Yagoozon*, 2014 WL 3109797, at *7.  Critically, harm to a plaintiff's "business does not equal

harm to competition," *Philadelphia Taxi Ass'n, Inc* v. *Uber Techs., Inc.*, 886 F.3d 332, 344 (3d

Cir. 2018), and "lost business" as a result of a defendant's "policy is not, in and of itself, a concern

of the antitrust laws," *SMS Sys. Maint. Servs., Inc.* v. *Digit. Equip. Corp.*, 188 F.3d 11, 26 (1st Cir.

1999) (citing *McQuillan*, 506 U.S. at 458–59).

Plaintiff has only pleaded a harm to its own business, *i.e.*, "an injury to itself, not an

anticompetitive injury to the market." *Chicago Studio Rental, Inc.* v. *Illinois Dep't of Com.*, 940

F.3d 971, 978 (7th Cir. 2019).  Plaintiff's claimed injury, and the entire basis of its antitrust claims,

is that Apple rejected its app for distribution on the App Store.  AC ¶ 15 ("Apple has restricted

trade . . . when it disallowed Plaintiff's reasonable application."); *id.* ¶ 31 ("Apple specifically

strategized to prevent Plaintiff's app from setting a precedent or amassing a user base, which could

jeopardize its own pipeline and/or the first-mover advantage of desirable institutional partners of

a monopolistic trust."); *id.* ¶ 53 ("Allowing the aforementioned competing apps, but disallowing

Plaintiff's, was arbitrary and capricious restraint of trade."); *id.* ¶ 63 ("There were no reasonable

grounds for Apple to deny the Coronavirus Reporter app for public distribution."); *id.* ¶ 81 ("Apple

unlawfully maintains its monopoly power in the iOS App Store through its unlawful denial of

access to Coronavirus Reporter.").

Furthermore, Plaintiff has pleaded no facts that demonstrate any anticompetitive harm

necessary to state a claim.  The Amended Complaint includes no allegations about prices at all,

and certainly no allegations about supracompetitive prices arising from purportedly restricted

output.  *See E & L Consulting, Ltd.* v. *Doman Indus. Ltd.*, 472 F.3d 23, 30 (2d Cir. 2006)

(explaining that a "monopolist manufacturer of a product restricts output of the product in order to

maximize its profits").  By acknowledging that apps like Plaintiff's could also be developed for Google smartphones, *see* AC ¶ 58, Plaintiff concedes that Apple lacks the power to restrict app output generally.

Plaintiff's failure to plead plausible harm to competition mandates dismissal of both its Section 1 and Section 2 claims.  *See Yagoozon*, 2014 WL 3109797, at *9–10 (rejecting § 1 claim because allegations of plaintiff's "lost sales" did not plead "actual or potential injury to competition"); *N.E. Carpenters Health Benefits Fund* v. *McKesson Corp.*, 573 F. Supp. 2d 431, 435 (D. Mass. 2008) (dismissing § 1 claim when there was "no allegation that [the defendant] reduced competition in any relevant economic market"); *Pistacchio*, 2021 WL 949422, at *2 (dismissing §§ 1 and 2 claims where complaint was "wholly lacking in any substantive allegations" regarding harm to competition); *ABG Prime Grp.*, 2018 WL 3474587, at *4 (dismissing § 1 claim when plaintiff did not "plead facts sufficient to show a market-wide injury to competition" and explaining that "[plaintiff's] injuries are not antitrust injuries"); *Chicago Studio Rental*, 940 F.3d at 978–79 (affirming dismissal of §§ 1 and 2 claims when complaint contained only conclusory allegations of reduced competition); *Malden Transportation, Inc.* v. *Uber Techs., Inc.*, 321 F. Supp. 3d 174, 180 (D. Mass. 2018) (dismissing § 2 claim when plaintiff alleged that defendant's conduct *increased* supply and *decreased* prices).

## II.      Plaintiff's Section 1 claim must be dismissed because it is predicated entirely on unilateral conduct.

Plaintiff's Section 1 claim fails for the additional reason that it is predicated entirely upon unilateral conduct—Apple's own, independent actions with respect to Plaintiff's app.

Section 1 of the Sherman Act is aimed at preventing concerted activity between a defendant and its *competitors*.  *See Gonzalez-Maldonado* v. *MMM Healthcare, Inc.*, 693 F.3d 244, 249 (1st Cir. 2012) (noting that a § 1 violation may occur "when a group of independent *competing firms*

engage in" concerted action, but dismissing complaint because it alleged only unilateral action by a single economic entity (emphasis added) (citations omitted)); *Qualcomm*, 969 F.3d at 989 (§ 1 "targets *concerted* anticompetitive conduct").  "Unilateral conduct by a single firm, even if it 'appears to "restrain trade" unreasonably,' is not unlawful under section 1 of the Sherman Act." *The Jeanery, Inc.* v. *James Jeans, Inc.*, 849 F.2d 1148, 1152 (9th Cir. 1988) (quoting *Copperweld Corp.* v. *Indep. Tube Corp.*, 467 U.S. 752, 767 (1984)); *Odishelidze* v. *Aetna Life & Cas. Co.*, 853 F.2d 21, 23 (1st Cir. 1988) (citing *Monsanto Co.* v. *Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984)) (affirming dismissal of § 1 claim because "unilateral action is not prohibited by § 1 of the Sherman Act").

Courts routinely dismiss Section 1 claims that are premised on one party's creation and announcement of terms to which another party is required to adhere.  *See Relevent Sports, LLC* v. *U.S. Soccer Fed'n, Inc.*, No. 19-CV-8359 (VEC), 2020 WL 4194962, at *6 (S.D.N.Y. July 20, 2020); *Sambreel Holdings LLC* v. *Facebook, Inc.*, 906 F. Supp. 2d 1070, 1076–77 (S.D. Cal. 2012); *Baar* v. *Jaguar Land Rover N. Am., LLC*, 295 F. Supp. 3d 460, 465 (D.N.J. 2018).  This means that a defendant "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."  *Dennis* v. *Husqvarna Forest & Garden Co.*, No. CIV. 94-309-M, 1994 WL 759187, at *3 (D.N.H. Dec. 27, 1994) (citing *Monsanto Co.*, 465 U.S. at 761).

Plaintiff's Section 1 claim must be dismissed under this bedrock principle.  Plaintiff challenges purely unilateral conduct by Apple: the rejection of Plaintiff's app under the terms of a policy Apple announced.  *See* AC ¶ 15 (p. 6) (alleging Apple "restricted trade" in violation of the Sherman Act "when it disallowed Plaintiff's reasonable application"); *id.* ¶ 5 ("Apple made the appalling determination that Coronavirus Reporter lacked 'deeply rooted medical credentials.'").  But the "announcement of policy and simple refusal to deal, without more, is not barred by [§] 1."

*Homefinder's of Am., Inc.* v. *Providence J. Co.*, 471 F. Supp. 416, 421 (D.R.I. 1979), *aff'd*, 621 F.2d 441 (1st Cir. 1980).

To the extent Plaintiff's Section 1 claim is predicated in any way on the agreements that app developers enter into with Apple, or the App Store Review Guidelines, that theory does not support a Section 1 claim either. Plaintiff's allegations in this regard again challenge only unilateral conduct—the terms on which Apple will do business with app developers—as Plaintiff's own allegations make clear. *See* AC ¶ 46 (taking issue with Apple's alleged "'self-policing' of *its* monopolistic Developer Agreement" (emphasis added)); *id.* ¶ 62 (alleging that developers must sign "Apple's Developer Agreement"); *id.* ¶ 110 (describing the Developer Agreement as Apple's "own").

Courts regularly dismiss Section 1 claims based on theories like Plaintiff's. In *Relevent Sports LLC* v. *U.S. Soccer Federation, Inc.*, for example, the United States Soccer Federation ("USSF") was "required to adhere" to certain of FIFA's policies, but that did not make it Section 1 concerted action; rather, it amounted merely to "unilateral compliance with FIFA's directive." 2020 WL 4194962, at *6–7. Likewise, in *Sambreel Holdings LLC* v. *Facebook, Inc.*, as a condition of using Facebook's website, Facebook required Application Developers to agree to use only Advertising Partners approved by Facebook, while Facebook separately entered into agreements with Advertising Partners that permitted Facebook to limit with whom Advertising Partners could "associate" on the Facebook platform. 906 F. Supp. 2d at 1076–77. These agreements were merely "unilateral action on the part of Facebook . . . impose[d] upon companies that utilize the Facebook Platform." *Id.* Finally, in *Baar* v. *Jaguar Land Rover North America, LLC*, allegations that Jaguar Land Rover North America and Jaguar Land Rover Limited "unilaterally implemented [a] Policy and required their dealers to enforce it" amounted only to unilateral conduct. 295 F.

Supp. 3d at 465. Accordingly, Plaintiff's Section 1 claim must be dismissed because it challenges only unilateral conduct.

### III.  Plaintiff's Section 2 claim fails because Plaintiff does not allege that Apple has monopoly power in a relevant market or engaged in exclusionary conduct.

Plaintiff's Section 2 claim fails for the additional reason that Plaintiff fails to allege facts in support of necessary elements of that claim.  To make out a Section 2 claim, a plaintiff must plead: (i) the possession of monopoly power in the relevant market, and (ii) the willful acquisition or maintenance of that power.  *Diaz Aviation Corp.* v. *Airport Aviation Servs., Inc.*, 716 F.3d 256, 265 (1st Cir. 2013) (affirming trial judgment in defendant's favor).  Possession of monopoly power alone is not unlawful unless accompanied by "exclusionary conduct."  *Town of Concord, Mass.* v. *Boston Edison Co.*, 915 F.2d 17, 21 (1st Cir. 1990) (reversing judgment in plaintiff's favor given, *inter alia*, failure to show exclusionary conduct).  Here, Plaintiff fails to allege both monopoly power and exclusionary conduct.  *See Americana Indus., Inc.* v. *Wometco de Puerto Rico, Inc.*, 556 F.2d 625, 628 (1st Cir. 1977) (affirming dismissal of §§ 1 and 2 claims when allegations did not support inference of market power and instead were "completely consistent with perfectly lawful conduct").

#### A.  Plaintiff fails to allege monopoly power.

Monopoly power is "the power to control prices or exclude competition."  *United States* v. *Grinnell Corp.*, 384 U.S. 563, 571 (1966) (quoting *du Pont de Nemours*, 351 U.S. at 391).  A plaintiff may demonstrate monopoly power by pleading "actual supracompetitive prices and restricted output," or by pleading the defendant's dominant share in a "well-defined relevant market" that has significant barriers to entry, and in which "existing competitors lack the capacity to increase their output in the short run."  *Coastal Fuels*, 79 F.3d at 196–97 (reversing § 2 verdict for failure to show monopoly power); *see also, e.g., Michael E. Jones M.D., P.C.* v. *UnitedHealth*

*Grp., Inc.*, No. 19-CV-7972 (VEC), 2020 WL 4895675, at *10 (S.D.N.Y. Aug. 19, 2020) (dismissing § 2 claims when complaint contained "nothing but conclusory assertions of monopoly power").

Plaintiff does not allege any facts to support a finding of monopoly power. As explained, Plaintiff includes no allegations about price whatsoever, much less any allegations of supracompetitive prices resulting from purportedly restricted output. *See Coastal Fuels*, 79 F.3d at 196–97; *see also supra* Section I.B   More fundamentally, because Plaintiff fails to plead a plausible relevant market, *see supra* Section I.A, it cannot plead Apple's purported monopoly power in that market. *See R & J Tool*, 2001 DNH 009, at 4–5. On its face, Plaintiff's Amended Complaint contemplates a market for applications that includes distribution platforms other than the App Store. *See* AC ¶¶ 57–58 (conceding that "Google products" and "a generic UNIX web browser" can be used to "[a]ccess . . . the national internet backbone" and that an app like Plaintiff's could be developed for Google smartphones). Further, Plaintiff pleads no facts related to Apple's alleged market share in any plausible market, allegedly significant barriers to entry, or alleged inability of competitors in this broader market to increase output. *Cf. Abid* v. *Google LLC*, No. 18-cv-00981-MEJ, 2018 WL 3458546, at *5 (N.D. Cal. July 18, 2018) ("Plaintiff undermines his own allegation by alleging that Google maintains a 'near monopoly' while elsewhere acknowledging various other on-line advertising platforms, such as 'Microsoft Bing' and 'Facebook ads.'").

Instead, Plaintiff relies on bald (and facially implausible) assertions that Apple is a monopolist and has market power. *See* AC ¶ 41 ("Apple is a monopoly as defined by the Sherman Antitrust Act."); *id.* ¶ 43 ("Apple knows it holds monopoly like power over many users' ability to exit the Apple ecosystem and access the internet through other means."); *id.* ¶ 81 ("Apple

unlawfully maintains its monopoly power in the iOS App Store through its unlawful denial of access to Coronavirus Reporter."); *id.* ¶ 88 ("Apple disallows applications in an arbitrary and capricious manner to benefit their own monopoly and their business and contract partners.").

Such allegations plainly do not suffice.  *See DeLima* v. *Google, Inc.*, No. 1:19-cv-978-JL, 2021 DNH 025P, 2021 WL 294560, at *7 (Jan. 28, 2021) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (quoting *Maldonado* v. *Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009)); (dismissing antitrust claims), *appeal filed*, No. 21-1161 (1st Cir. Feb. 26, 2021); *Michael E. Jones*, 2020 WL 4895675, at *10.

**B.     Plaintiff fails to plead exclusionary conduct.**

Plaintiff also fails to allege exclusionary conduct, that is, "the willful acquisition or maintenance of" monopoly power "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *Verizon Commc'ns Inc.* v. *Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (quoting *Grinnell Corp.*, 384 U.S. at 570–71).

The exclusionary conduct Plaintiff seems to plead is that Apple rejected Plaintiff's proposed app under its stated policies regarding COVID-19 apps and its standard contract terms. *See* AC ¶ 81 (alleging that Apple "maintains its monopoly power in the iOS App Store through its unlawful denial of access to Coronavirus Reporter"); *id.* ¶ 5 ("Apple made the appalling determination that Coronavirus Reporter lacked 'deeply rooted medical credentials.'").  But that alleged exclusionary conduct does not support an antitrust claim.

Plaintiff's theory runs headlong into Supreme Court precedent.  In the absence of a duty to deal with competitors (even assuming—although Plaintiff does not adequately allege it—that Apple and Plaintiff compete), a defendant "has no obligation to deal under terms and conditions favorable to its competitors."  *Pac. Bell Tel. Co.* v. *linkLine Comm'cns, Inc.*, 555 U.S. 438, 450 (2009); *see also Homefinders of Am., Inc.* v. *Providence J. Co.*, 621 F.2d 441, 443 (1st Cir. 1980)

(finding no antitrust violation in newspaper's refusal to deal with advertiser who violated newspaper's advertising policy).

*Bookhouse of Stuyvesant Plaza, Inc.* v. *Amazon.com, Inc.*, 985 F. Supp. 2d 612 (S.D.N.Y. 2013), is instructive. There, Amazon's digital right management access control technology ("DRM") restricted the ability to read Amazon-distributed e-books to Kindle devices and non-Kindle devices enabled with a Kindle app. *Id.* at 617. The plaintiffs alleged that the DRM requirement was anticompetitive conduct "designed to leverage Amazon's domination of the dedicated e-reader market." *Id.* Relying on *Trinko*, the court dismissed the complaint because, at bottom, plaintiffs merely complained that Amazon had refused to deal with them by not allowing "them to sell e-books on Amazon's devices and apps," but Amazon had no obligation to do so. *Id.* at 623; *see also In re Elevator Antitrust Litig*., 502 F.3d 47, 52 (2d Cir. 2007) (affirming dismissal where alleged anticompetitive conduct—elevator manufacturer designed elevators to prevent servicing by other providers and refused to sell elevator parts and tools, for example, to maintenance providers—was within manufacturer's right of refusal to deal).

Finally, even assuming Apple's "competitors" included third parties, like Plaintiff, developing COVID-19 apps, Plaintiff's own allegations make clear that Apple allowed competitors' apps. AC ¶ 96 ("*Competitor* apps that were allowed in March 2020 obtained millions of downloads and a top rank in the App Store, demonstrating the strong demand for COVID information applications at that time." (emphasis added)).  Apple expressly recognized that apps could serve a useful function in combating the pandemic and, consistent with that position, approved apps according to the policy it laid out in March 2020. *See id.* ¶¶ 3, 6, 50–52, 96.

## IV.    Plaintiff's breach of contract claim must be dismissed because the Amended Complaint pleads no facts showing any breach of a contract.

Plaintiff alleges that "Plaintiff and Defendant had entered into a contract" and that "Apple's

Developer Agreement as amended in March 2020 promised that entities with 'deeply rooted medical credentials' were permitted to publish COVID apps on the App Store."  AC ¶¶ 100–101. Plaintiff alleges that "Apple breached their own Developer Agreement when they refused to allow an entity with deep-rooted medical expertise to publish on the App Store."  *Id.* ¶ 110.

Under California law,[5] to state a breach-of-contract claim, a plaintiff must plead facts showing: (i) the existence of a contract; (ii) "plaintiff's performance or excuse for nonperformance"; (iii) "defendant's breach"; and (iv) "resulting damages to plaintiff."  *Hamilton* v. *Greenwich Invs. XXVI, LLC*, 126 Cal. Rptr. 3d 174, 183 (Cal. Ct. App. 2011), *as modified,* (June 15, 2011) (quoting *Reichert* v. *Gen. Ins. Co.*, 442 P.2d 377, 381 (Cal. 1968)).  Plaintiff "must identify the specific provision of the contract allegedly breached by the defendant."  *Donohue* v. *Apple, Inc.*, 871 F. Supp. 2d 913, 930 (N.D. Cal. 2012) (citing *Progressive W. Ins. Co.* v. *Yolo Cnty. Super. Ct.*, 37 Cal. Rptr. 3d 434, 449 (Cal. Ct. App. 2005)); *see also Becton, Dickinson & Co.* v. *Cytek Biosciences Inc.*, No. 18-cv-00933-MMC, 2020 WL 1877707, at *3 (N.D. Cal. Apr. 15, 2020) (dismissing contract-breach claim for failure to "allege the substance of [the contract's] relevant terms" (quoting *McKell* v. *Wash. Mut., Inc.*, 49 Cal. Rptr. 3d 227, 253 (Cal. Ct. App. 2006))).  Plaintiff fails to allege facts showing a contract term that promised that apps with deeply-rooted medical credentials would be allowed on the App Store, and thus fails to allege any breach.

Plaintiff conclusorily alleges that the Developer Agreement was amended in March 2020 and that Apple breached this "amended" agreement.  AC ¶¶ 101, 110.  The Developer Agreement is the only contract Plaintiff specifically names and pleads that Apple breached.  *Id.* ¶ 110 ("Apple breached their own Developer Agreement when they refused to allow an entity with deep-rooted

---

[5]  California law governs Plaintiff's contract claims, as Plaintiff conceded in its most recent pleading.  *See* ECF No. 23 ¶ 17 ("California contract law applies for sure.").  The Developer Agreement states that it will be "construed in accordance with" California law.  Ex. A § 17.

medical expertise to publish on the App Store.").  Because Plaintiff's breach-of-contract claim is "expressly linked" to and depends on the Developer Agreement's terms, this Court may consider the agreement on a motion to dismiss.  *Alt. Energy*, 267 F.3d at 34 (citation and internal quotation marks omitted).

Plaintiff does not identify a single term in the Developer Agreement that Apple allegedly breached.  The terms of the Developer Agreement are basic ones governing a developer's "participation as an Apple developer."  Ex. A, pmbl.  The terms set out: the lack of any partnership or agency relationship between Apple and developers (*id.* § 1); how a developer may use Apple products, services, and intellectual property provided to it (*id.* §§ 2–3, 7, 8, 12); and a developer's confidentiality obligations (*id.* §§ 4–6).  Nowhere in the Developer Agreement does Apple promise to allow COVID-19 apps from entities with "deeply rooted medical credentials" into the App Store.  And in fact, nowhere in the Developer Agreement does Apple make any promise whatsoever about any kind of app that it will allow in the App Store.[6]

Plaintiff attempts to maneuver around this problem by alleging that the Developer Agreement was "amended" when Apple announced its policies for COVID-19 apps.  AC ¶¶ 3, 101.  This effort fails for two reasons.  First, Plaintiff alleges that, on March 3, 2020, Apple "announced" an initial set of entities that would be permitted to submit apps related to COVID-19 for review, and then "added" deeply credentialed healthcare companies to that "list."  *Id.* ¶ 3.  But none of these allegations identifies any promise by Apple to allow certain apps onto the App Store. *See Donohue*, 871 F. Supp. 2d at 931 (rejecting plaintiff's argument that Apple's User Guide

---

[6]   It is the DPLA that sets out criteria for apps' submission and entry into the App Store, a contract Plaintiff does not allege was breached.  *See* ECF No. 19-5, at 1 (explaining in the agreement's opening "Purpose" section that apps "that meet Apple's Documentation and Program Requirements may be submitted for consideration by Apple for distribution via the App Store").  Nor could Plaintiff so allege, as the DPLA is clear that Apple has no contractual duty whatsoever to admit any app onto the App Store; rather, that decision is placed in Apple's "sole discretion."  *Id.* §§ 3.2, 6.9.

contained contractual promises because the User Guide "includes no 'promises' which plaintiff could have 'accepted'").

Second, Plaintiff pleads no facts showing how the Developer Agreement was allegedly amended by Apple's announcement.  The Developer Agreement's plain terms also show that Plaintiff's conclusory allegation of amendment is implausible.  *See Garibaldi* v. *Bank of Am. Corp.*, No. C 13-02223 SI, 2014 WL 172284, at *3 (N.D. Cal. Jan. 15, 2014) ("mere legal conclusions that a contract existed and was breached will be insufficient to survive a motion to dismiss"); *Young* v. *Facebook, Inc.*, 790 F. Supp. 2d 1110, 1117 (N.D. Cal. 2011) (dismissing conclusory allegation that Facebook did not perform in accordance with terms of agreement when amended complaint offered no "specificity as to what contractual provisions Facebook allegedly violated"); *Roberts* v. *UBS AG*, No. CV F 12-0724 LJO SKO, 2013 WL 1499341, at *20 (E.D. Cal. Apr. 11, 2013) (dismissing plaintiff's "vague and conclusory" contract-breach claims because plaintiff failed "to identify sufficiently precise contract terms, their breach, who breached them, and how they were breached"); *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 979 (N.D. Cal. 2016) (same).

The Developer Agreement states that "Apple reserves the right, at its discretion, to modify this Agreement, including any rules and policies at any time." Ex. A § 9.  Critically, the Agreement also provides: "No addition to or removal or modification of any of the provisions of this Agreement will be binding upon Apple unless made in writing and signed by an authorized representative of Apple."  *Id.* § 19; *see Griffin* v. *Green Tree Servicing, LLC*, No. CV-14-9408-MWF (VBKx), 2016 WL 6782764, at *5 (C.D. Cal. Apr. 11, 2016) (holding express terms of contract foreclosed any of plaintiff's claims alleging additional promises made by defendant). Nowhere does Plaintiff allege any facts showing how Apple's public announcement satisfies these

requirements.  And the Developer Agreement indicates, on its face, that it was last modified in June 2015, precluding any assertion that it was later modified in any way that was binding on Apple.  Ex. A at p. 6.

In sum, the Amended Complaint alleges no facts showing that Apple promised in any contract with Plaintiff that it would allow apps with "deeply rooted medical credentials" to publish COVID-19 apps on the App Store.  AC ¶ 101.  Accordingly, Plaintiff fails to allege both the existence of a contract term and Apple's breach thereof, so this claim must be dismissed.[7]

## V.   The breach of the implied covenant of good faith and fair dealing claim must be dismissed.

"Under California law, a claim for breach of the covenant of good faith and fair dealing requires that a contract exists between the parties, that the plaintiff performed [its] contractual duties or was excused from nonperformance, that the defendant deprived the plaintiff of a benefit conferred by the contract in violation of the parties' expectations at the time of contracting, and that the plaintiff's damages resulted from the defendant's actions."  *Singh* v. *Google Inc.*, No. 16-CV-03734-BLF, 2017 WL 2404986, at *3 (N.D. Cal. June 2, 2017) (internal quotation marks and citation omitted).  Actionable conduct "involves something beyond breach of the contractual duty itself" and requires "a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act." *Careau & Co.* v. *Sec. Pac. Bus. Credit, Inc.*, 272 Cal. Rptr. 387, 399–400 (Cal. Ct. App. 1990) (quoting *Congleton* v. *Nat'l Union Fire Ins. Co.*, 234 Cal. Rptr. 218, 222 (Cal. Ct. App. 1987)).

### A.   Plaintiff's implied covenant claim is identical to its breach-of-contract claim.

Plaintiff's implied covenant claim fails because it is identical to Plaintiff's breach of

---

[7]   Nor does Plaintiff allege its own performance or excuse for nonperformance, another basis for dismissal. *See Hamilton*, 126 Cal. Rptr. 3d at 183.

contract claim. If allegations in a breach of implied covenant claim "do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated." *Soundgarden* v. *UMG Recordings, Inc.*, No. LA CV19-05449 JAK JPRx, 2020 WL 1815855, at *17 (C.D. Cal. Apr. 6, 2020) (quoting *Careau*, 272 Cal. Rptr. at 400).

Plaintiff's implied covenant allegations rehash Plaintiff's breach-of-contract theory—that Apple impermissibly rejected Coronavirus Reporter's proposed iOS app. *Compare* AC ¶ 110 ("Apple breached their own Developer Agreement when they refused to allow an entity with deep-rooted medical expertise to publish on the App Store."), *with id.* ¶ 116 ("Apple breached the covenant when, during an international pandemic emergency, they disregarded established medical hierarchies and blocked [Coronavirus Reporter's alleged chief medical officer] from using the internet to help people disseminate epidemiological data."). Plaintiff also seeks the same "substantial damages" for its implied covenant and breach of contract claims. *Compare id.* ¶ 112 (breach of contract), *with id.* ¶ 119. Plaintiff's implied covenant claim is thus superfluous and must be dismissed. *See Vigdor* v. *Super Lucky Casino, Inc.*, No. 16-CV-05326-HSG, 2017 WL 2720218, at *4 (N.D. Cal. June 23, 2017) (dismissing breach of implied covenant claim where it "relies on the same acts—and seeks the same damages—as their claim for breach of contract").

### B.   Plaintiff fails to identify any express contractual term that was allegedly frustrated through Apple's purported conduct.

Plaintiff's implied covenant claim also must be dismissed because Plaintiff has not pled a specific, express contract term on which to hinge any implied duty. "[T]he implied covenant is 'limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated by the contract.'" *Donohue*, 871 F. Supp. 2d at 932 (quoting

*Pasadena Live, LLC* v. *City of Pasadena*, 8 Cal. Rptr. 3d 233, 237 (Cal. Ct. App. 2004)); *see also id.* at 931 (holding that a user guide did not provide terms of the contract); *Plastino* v. *Wells Fargo Bank*, 873 F. Supp. 2d 1179, 1191–92 (N.D. Cal. 2012) (dismissing implied covenant claim where plaintiff "pointed to no specific contractual provision that was frustrated" and instead pointed to a purported extra-contractual promise).   Here, as explained, Apple never "promised" in the Developer Agreement (or anywhere else) that entities with "deeply rooted medical credentials" would be "permitted to publish COVID apps on the App Store." AC ¶ 101; *see also supra* Section IV.  And Plaintiff points to no other term in the Developer Agreement upon which to hinge any implied duty.

        To the extent Plaintiff attempts to rely on some implied covenant untethered to any contract, that too fails.  Plaintiff alleges that "Apple breached the covenant when, during an international pandemic emergency, they disregarded established medical hierarchies and blocked Dr[.] Roberts from using the internet to help people disseminate epidemiological data" and that "[t]here was no good faith when Apple focused on their own success, and blocked a research professor such as Dr[.] Roberts."  AC ¶¶ 116, 118.  These allegations are divorced from any express contract term, and fail to show any term that was frustrated.  *Soundgarden*, 2020 WL 1815855, at *17 (implied covenant "will not apply where no express term exists on which to hinge an implied duty, and where there has been compliance with the contract's express terms" (quoting *Berger* v. *Home Depot U.S.A., Inc.*, 476 F. Supp. 2d 1174, 1177 (C.D. Cal. 2007)).  Accordingly, Plaintiff's claim for breach of the implied covenant of good faith and fair dealing "necessarily fails."  *Howell* v. *Travelers Com. Ins. Co.*, No. SC127387, 2019 WL 6620643, at *3 (Cal. Super. Ct. Nov. 5, 2019); *see also Careau*, 272 Cal. Rptr. at 399–400 (explaining that allegations supporting a claim for breach of the implied duty "must show" that the defendant's conduct

"demonstrates a failure or refusal to discharge *contractual responsibilities*" (emphasis added)).

## CONCLUSION

For the foregoing reasons, Apple respectfully requests that the Court dismiss Plaintiff's Amended Complaint for failure to state a claim.

Respectfully submitted, this 12 day of April, 2021,

APPLE INC.
By and through its attorneys,

By: /s/ Kevin M. O'Shea_____

| | |
|---|---|
| SULLOWAY & HOLLIS, PLLC | PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP |
| Kevin M. O'Shea, Esquire | Jessica E. Phillips, Esquire |
| New Hampshire Bar No. 15812 | Admitted Pro Hac Vice |
| Allyson L. Moore, Esquire | Martha Goodman, Esquire |
| New Hampshire Bar No. 272208 | Admitted Pro Hac Vice |
| 9 Capitol Street | 2001 K Street, NW |
| Concord, New Hampshire 03301 | Washington, DC 20006-1047 |
| (603) 223-2800 | (202) 223-7300 |
| koshea@sulloway.com | jphillips@paulweiss.com |
| amoore@sulloway.com | mgoodman@paulweiss.com |

## CERTIFICATE OF SERVICE

I hereby certify that this pleading was filed through the ECF/CM system and will be sent to all parties of record through ECF/CM.

Counsel for Coronavirus Reporter
Keith Mathews, Esquire
Associated Attorneys of New England
P.O. Box 278
Manchester, NH  03105
(603) 622-8100
keith@aaone.law

Date:  April 12, 2021                    By: /s/ Kevin M. O'Shea_____