UNITED STATES DISTRICT COURT
FOR THE NEW HAMPSHIRE DISTRICT

|  |  |
|---|---|
| CORONAVIRUS REPORTER and<br>FIVE UNNAMED APPS,<br>on behalf of themselves and all others similarly situated<br><br>Plaintiffs,<br><br>vs.<br><br>APPLE INC.<br>Defendant. | NHD Docket: 21-cv-47-LM<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**SECOND AMENDED<br>COMPLAINT FOR DAMAGES<br>AND INJUNCTIVE RELIEF**<br><br><br>DEMAND FOR JURY TRIAL |

## PLAINTIFF'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## I.     INTRODUCTION

1. This class action seeks to redress the injustices Apple committed to the developer base that the monopoly necessarily relies upon to exist. Documented herein are the anti-competitive business practices that have become the norm at Apple, and how they have harmed Coronavirus Reporter, five unnamed apps, and countless other class members that shall be identified in discovery.

2. As the US House of Representatives Subcommittee on Antitrust recently exposed, Apple, when it suited them with Chinese developer Baidu, appointed two Apple employees to help them navigate the murky waters of the Apple App Store. The Plaintiffs in this case, however, weren't so lucky to obtain such hand-holding– their thousands of person-hours of work were tossed away by Apple, with illegal rejections that, according to the same US House report, even astonished many Apple employees.

3. This is a rapidly evolving legal matter. Apple has become the richest corporate entity in the world, thriving from 30% commissions and deeply curated – and restricted – trade outputs in the App Store that launched over a decade ago. Apple wants the public to believe it is all in the name of safety and consumer privacy. Last week, the New York Times asked Apple CEO Mr. Tim Cook for his statement regarding growing concerns over Apple's unyielding power and absolute control over the App Store. His response – "somebody has to" – certainly sounds more like the divine right of kings than a new age technology company.

4. Mr. Cook's logic has one fatal flaw. For over forty years, and still today, the Apple Mac ecosystem healthfully thrived without such policing. Mac users simply aren't begging

Apple to police their computer software due to an imaginary flood of privacy violations and other ills.

5. Representing a class of developers who directly suffer from Apple's ever-expanding power grab is Coronavirus Reporter and Five Unnamed Apps. Between these six case studies, counsel in the class action endeavors to represent the best interests of, and provide a voice to, other developers that have thus far been silenced.

6. In February 2020, the Coronavirus Reporter Plaintiff formed an emergency *ad hoc* group of health care and computer science experts to develop a smartphone application named "Coronavirus Reporter." The COVID-19 pandemic was named on February 11, 2020. The first death in France on February 14 was followed by an outbreak in Italy, and the United States reported its first death on February 29. The Coronavirus Reporter app was completed on March 3, 2020, at which time there was not a single Coronavirus app on the Apple iOS App Store. While some debate existed, most of the United States population, government scientists, and healthcare experts did not predict the rapid extent to which COVID would spread nationally and globally. Within a month, the United States led the world in confirmed cases, social distancing became a familiar term, and millions lost their jobs.

7. The Coronavirus Reporter application ("the app") was developed to capture and obtain critical biostatistical and epidemiological data as it happened. For the first time in the history of pandemics, social media could provide new insights of an entire population that simply could not be obtained from traditional doctor office visits and other screening methods. The app's operation was a simple and familiar "geolocation" map where users

would self-identify disease symptoms such as cough, fever, or other yet to be discovered symptoms.

8. In response to the emerging crisis, on March 3, the same day the app was complete, Apple announced that applications dealing with coronavirus would only be allowed from "recognized institutions such as government, hospital, insurance company, NGO, or a university." The app was rejected on these grounds. On appeal, the development team requested that Apple expand the rule to allow corporations other than insurance companies, such as biotechnology or bioinformatics firms. Apple agreed, and added "deeply credentialed" health care corporations to the list of permissible entities. Apple was then provided with supporting and sponsorship documentation, including the *curriculum vitae* of Coronavirus Reporter's Chief Medical Officer, Robert Roberts M.D., FRCPC, FRSM, FACP, FESC, FAHA, FISHR, MACC, LLD (Hon.), FRSC. Dr Roberts invented the MBCK assay, the gold-standard test for detecting myocardial infarction (i.e. heart attack) used for three decades and regarded as one of the most effective screening tools in medical history. The MBCK test vastly reduced MI associated morbidity and mortality; in other words, Dr Roberts' invention saved a very large number of lives.

9. As NASA Head Cardiologist during the Space Race, Dr Roberts personally signed off on John Glenn's historic mission. Dr Roberts spent five years as a Board Director for the Nobel prize in mathematics, the Fields Medal.

10. After a very long twenty days of waiting, Apple issued a final command that the Coronavirus Reporter app would not be permitted on the App Store. Apple made the appalling determination that Coronavirus Reporter lacked "deeply rooted medical credentials." Apple also stated that the "user-generated data has not been vetted for

accuracy by a reputable source." In other words, Apple told Dr. Roberts that he, and his self-reported symptoms app model, were not "deeply rooted" in the world of medical credentials.

11. About one month after rejecting the app, Apple permitted several employees at a London teaching hospital to distribute a COVID app on the App Store that functioned nearly identically to Coronavirus Reporter. That competing app obtained the so-called first mover advantage, and is currently used by five million individuals daily.

12. In the following months, Apple formed a partnership with their chief rival and several other universities to create a contact-tracing COVID app. After much delay, the contact-tracing App launched in Summer 2020. Although contact tracing has worked in some limited scope, much resistance in this country exists. The Apple contact tracing app generally underperformed expectations and failed to obtain a user base in the United States. Nonetheless, research by a Turing/Oxford team into the epidemiological impact of the app suggests the UK version of the app has prevented 600,000 coronavirus cases since it was launched.

13. Coronavirus Reporter was ready months before other world-class COVID app products, and would likewise have prevented deaths in the US and other countries where the NHS/Apple app did not succeed. Deaths would have been prevented through both the informal contact tracing geolocation functionality, as well as "situational awareness" offered by the app that does not exist in the UK/Apple app. Apple's denial of the Coronavirus Reporter app resulted in unnecessary deaths.

14. The Sherman Act prohibits monopolization of any part of the trade or commerce among several States, or with foreign nations. Likewise, the Sherman Act prohibits every contract or conspiracy in restraint of trade among several States, or with foreign nations.

15. The internet was developed by DARPA, a research and development division of the United States Department of Defense. ARPANET was the first packet switched distributed TCP/IP network, the backbone foundation of what we today call the internet. This military research endeavor aimed to provide resilient data transmission infrastructure linking persons around the country and the globe. Considerable taxpayer dollars funded DARPA, and continue to fund urban and rural infrastructure rollout of TCP/IP (internet) data services through fiber optics, wireless spectrum allocations, and other ongoing network infrastructure deployments.

16. The COVID pandemic serves as a prime example of how ARPANET and its subsequent implementations is particularly well-suited for communication during a national emergency.

17. As ARPANET and the internet developed over time, many of its characteristic distributed networking features have become compromised by the growth of corporate entities that control vast access points. Of particular concern is that unfettered growth of a monopolistic trust, as defined by the Sherman Act, could seriously restrict interstate commerce, and the free exchange of information. A computer scientist who writes software applications that rely upon a free and open internet may be encumbered, should one of these monopolistic trusts destroy access to the internet's free markets and information exchanges.

18. Defendant Apple Inc. did just that, denying millions of citizens the benefit of communicating in a pandemic emergency using an app designed by a world renowned physician. Indeed, that physician had particular experience in dealing with novel medical situations as exemplified by the fact that he personally gave astronauts the green light to explore unchartered territory.

19. Nearly 60% of users and 80% of paid internet commerce access the national internet backbone using Apple devices. For many millions of these users, their *de facto* access to the internet relies upon using an iOS device. Consider, for example, children or elderly who have been taught to access the internet using a relative's Apple device and have absolutely no reasonable alternative. As such, Apple operates a *de facto* monopoly for access to the national internet communication backbone.

20. Apple has restricted trade, communication, and free information exchange, all in violation of the Sherman Act, when it disallowed Plaintiff's reasonable application.

## II.    JURISDICTION AND VENUE

12. Venue in the New Hampshire District is proper under 15 U.S.C. § 22, which states that any suit proceeding under antitrust laws against a corporation may be brought in any district where it transacts business. Apple transacts business in New Hampshire. Additionally, some officers of the Plaintiff corporation reside in New Hampshire and did not personally waive venue via the Apple Developer Agreement. It is also alleged that the venue waiver is a monopolistic contract that is forced upon any developer who wishes to make applications that access the national internet backbone, and is itself a violation of the Sherman Act. Furthermore, it is alleged that Apple would have an unfair advantage if

all antitrust actions had to be litigated in the Northern California district, where Apple employs tens of thousands of individuals.

13. This Court has subject matter jurisdiction, pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. 1332 (d), because the proposed classes consist of 100 or more members, the amount in controversy exceeds $5,000,000, and at least one member of the class of plaintiffs is a citizen of a state different from Defendant Apple, a California corporation. Jurisdiction in this Court for a permanent injunction arises under 28 U.S.C. § 1331, for federal questions presented pursuant to 15 U.S.C. § 26 (Clayton Antitrust Act). Diversity jurisdiction is invoked pursuant to 28 U.S.C. § 1332 because the parties reside in different districts and the amount in controversy exceeds $75,000.

## III.   PARTIES

14. Plaintiff Coronavirus Reporter is a Wyoming Corporation with officers based in New Hampshire, Vermont, and Upstate NY. Coronavirus Reporter is also the name of the Plaintiff's iOS application, which uses the national internet background to allow citizens to self report and geolocate emerging pandemic trends. As such, it belonged to the entire group of  "COVID startups" banned by Apple. Plaintiff asserts standing as both a corporation, and additionally as the collective individual persons comprising the corporation, who have no contractual relationship with the Defendant and never signed the Apple Developer Agreement.  Dr Roberts never signed any waiver or contract with Apple pertaining to the distribution and access to his medical scientific work product.

15. Plaintiffs Unnamed App #1 through #5, inclusive, are United States based legal entities that own the intellectual property, litigation rights, and downstream revenue rights to their respective iOS application. Each unnamed app was excluded from distribution on

the app store, or effectively excluded through App Store ranking suppression and excessive commissions.

16. Unnamed App #1 is an app that, in April 2020, was disallowed by Apple because it sought to be ranked using keywords related to Coronavirus. These were particularly appropriate, as the app, like Coronavirus Reporter, was a startup trying to assist people with the new quarantine situation. Keywords like "quarantine" resulted in the apps banning. It is owned by its parent Florida corporation. This startup had no affiliation whatsoever with Dr. Roberts. As such, it represents another distinct app within the entire group of "COVID startups" banned by Apple.

17. Unnamed App #2 is in the financial technology industry. This app was disallowed by Apple in 2017 under false pretenses, citing it promoted risk transactions, when it plainly did not. Apps with similar functions were allowed on the Apps Store and not held to the arbitrary standard that Apple applied to Apple App #2. This app has a parent LLC in New Jersey. The development team is based in Brooklyn, New York.

18. Unnamed App #3 is an information search utility. It had been ranked in Apple's top ten utility apps, having innovated its field, but was suddenly disallowed and de-ranked when Apple alleged it created privacy concerns. An Israeli app replaced Unnamed App #3 in the rankings. The Israeli app functioned nearly identically but had even greater usage of data that Apple objected to on privacy grounds. Unnamed App #3's team felt cronyism and favoritism at Apple caused its downfall. The App is held by a US corporation in the Eastern time zone.

19. Unnamed App #4 is a marketplace platform focused on telemedicine. This App was denied distribution in 2017 because it did not use Apple In-App Payments. In App

Payments charge an economically inefficient 30% royalty to Apple. A physician using Unnamed App #4 with IAP would receive about 60% of the amount billed. In contrast, when Unnamed App #4 was submitted to Apple using standard credit card processing, a physician would receive almost 95% of the amount billed. Unnamed App #4's owners and developers were chiefly in Rhode Island at the time of development and disallowment.

20. Unnamed App #5 is also a videoconferencing platform. This App was likewise required to use Apple In-App Payments. A consultant offering advice over Unnamed App #5 with IAP would receive about 60% of the amount billed. Unnamed App #5 had notable functional difference from App #4, but nonetheless had a non-viable business model as a result of Apple's excessive commissions. The app team believes it was subject to ranking suppression because it used non-Apple development tools. Specifically, it was written in Apache Cordova, rather than Swift or Objective-C. Unnamed App #5 is also an East Coast based developer.

21. Defendant Apple Inc. is a California corporation with its principal place of business in Cupertino. Apple is the largest public company in the world, with a current market capitalization of approximately $3 trillion. Apple designs, markets, and sells smartphones (the iPhone) and computers (the Mac), which functionally rely upon and profit immensely from access to the taxpayer-funded national internet backbone. Apple owns and operates the App Store, which serves as a distribution gateway to the national internet backbone for third-party developers. Pending related litigation against Apple alleges that Apple violates antitrust law by disallowing competing app stores designed by third parties. Notably, this lawsuit does not seek remedy in the form of additional "app

stores," rather it seeks an injunction preventing the Apple App Store from disallowing applications of reasonable intention, of adequately functionality, and of legal subject matter. It proposes doing so through an the due process afforded by an independent App Court, the first law enforcement body of its kind devoted solely to computer code and applications, and even IAP payment processor fairness. In other words, the Apple App Store violates antitrust law by disallowing third-party applications using arbitrary and capricious standards meant to camouflage Apple's own self-interest and growth of their monopolistic trust.

22. A represented party to a lawsuit may proceed in an anonymous fashion if there is substantiated concern for their well-being, should they be named. Under the Federal Rules, if a party may be subject to injury and/or harassment, their name may be withheld. Here Plaintiffs Unnamed Apps #1-#5 file with their identities known to counsel only, because of significant risk of harm. A House report (see *infra*) describes "complete tyranny" at the App Store to developers who step out of line. Another developer, Epic, who filed an anti-trust lawsuit challenging Apple's practices had their products completely banned from the App Store in retaliation for filing suit. Epic required injunctive action request to a federal court to reverse the harm. A recent news article in CNBC (Exhibit B, incorporated herein) states that developers live in fear of Apple: "we are all afraid."

23. Unnamed Apps #1 - #5 are much smaller than Epic, and cannot afford to face retaliation from Apple, especially because some of these apps still generate significant income from the App Store. Apple has shown ill-will towards Plaintiff Coronavirus Reporter which resulted in at least five news articles being published this month quoting Apple's false

pleading remarks that this present action was filed with "disregard for the law" and in a "cavalier" fashion. Plaintiffs reserve the right to seek separate damages for these false claims.

24. Remarkably, Apple argued to the Supreme Court that developers exactly like the Plaintiffs here have standing to bring exactly the types of antitrust claims we brought. Apple argued in *Pepper* that consumers didn't have standing to bring these actions, but developers did (See *infra*). Whether it is the App Store, or the Supreme Court, Apple has a serious problem making self-serving, and pretextual decisions to harm the very developers that tirelessly work to make the Apple ecosystem viable.


## IV.  **FACTUAL HISTORY**

25. Introductory paragraphs preceding this paragraph are asserted herein and responsive pleading is hereby noticed as necessary.

26. Apple operates the App Store, and has exclusive control over iOS applications and their ability to access that national internet backbone.

27. The national TCP/IP internet backbone was built, at least in part, using taxpayer dollars for ARPANET.

28. Apple has profited immensely from the existence of the national internet backbone.

29. Without the internet, and the taxpayer dollars that built it, Apple would not enjoy the $2 trillion valuation it has amassed.

30. The Apple smartphone ecosystem is primarily a graphical user interface software (iOS) and hardware configuration, connecting users to the national internet backbone.

31. Apple initially developed the App Store to serve as a quality control gateway, ensuring apps functioned to a satisfactory standard and didn't contain software bugs or illegal content.

32. Over the years, Apple has taken a more authoritarian approach to the App Store and has rejected and/or disallowed significant numbers of third-party applications.

## **Emerging Antitrust Proceedings**

33. Antitrust regulation of Big Tech is a rapidly emerging matter of global public interest.

34. The global population rapidly adopted smartphone internet connectivity over the past decade. This has lead to vast implications which we are in the very early stages of fully understanding.

35. Nonetheless, it is reasonable to state that a sizeable proportion of the US population has growing questions and concern over the hegemony of Big Tech, including the types of claims here brought by Plaintiffs and the class members.

36. There are at least several emerging antitrust proceedings of particular relevance to this case. These include:

- The "Investigation of Competition in Digital Markets" majority staff report and recommendation by the United States House of Representatives Subcommittee on Antitrust, herein referred to as the "House report." The facts uncovered by the House report applicable to Apple (*Exhibit B*) are hereby wholly incorporated herein.

- A European Commission investigation into the App Store, launched in June 2020. ("The EC investigation").

- A consumer class action antitrust lawsuit filed in 2011 alleging App Store violations of Sherman in the app aftermarket (i.e. Kodak downstream theory). This lawsuit was

incorrectly dismissed by a Northern California judge, only to be remanded eight years later by the Supreme Court. *Pepper v. Apple Inc*, 11-cv-6714-YGR. The *Pepper* complaint and findings of fact relevant to and supporting this case are hereby incorporated herein.

- A developer class action antitrust lawsuit filed in 2019 alleging App store violations of Sherman in the app aftermarket, or submarkets. *Cameron et al v, Apple*, 19-cv-3074-YGR. The *Cameron* class is restricted to app developers who sold apps for non-zero prices. Supporting evidence and facts of the *Cameron* complaint are incorporated herein.

- An app distributor lawsuit for Sherman violations was filed in 2020 in Northern California, *Saurikit (aka Cydia) v. Apple*, 20-cv-8733-YGR. *Cydia* alleges it was the first to implement an app store on the iPhone ecosystem, and has been improperly booted from the market by Apple. *Cydia* seeks injunctive relief to require Apple to allow competing App Stores. Likewise, *Epic v. Apple*, 20-cv-5640-YGR seeks such relief to permit the games developer to open competing app games stores. Epic is a multinational entertainment company that has invested in substantial work with the Cravath law firm to discover Apple's anti-competitive conduct.  Their discovery is expected to be useful to support our class members claims. By building upon the findings of Cravath (Exhibit C), Plaintiffs' counsel may devote its resources almost entirely to a new branch of discovery: identifying and assisting countless developers, even small developers of free apps, who have been subjected to anti-competitive practices by Apple. Counsel intends to focus discovery on exposing these stories of developers who have suffered devastation from improperly denied or suppressed apps, representing thousands of lost person-years of advanced programming work.

37. The "Investigation of Competition in Digital Markets" majority staff report and recommendation by the United States House of Representatives Subcommittee on Antitrust provides compelling support and evidence supporting the Plaintiffs and class members claims. The report asserts that Apple's control over iOS provides it with gatekeeper power over software distribution on iOS devices. The report declares Apple has "monopoly power over distribution of software applications on iOS devices." The report quotes Apple executives as stating that Apple is "not subject to any meaningful competitive constraint" in this channel. This results in "supra-normal" profits according to the report.

38. Apple makes $2.7 billion annually simply from charging developers $99 to access their platform. This fee is more than quadruple the fee of the nearest rival, and has directly harmed Plaintiffs and class members.

39. The report explains how eliminating IAP tying could be done by allowing other payment processors like PayPal, VISA, etc. to service the market. This tying has directly harmed a large subgroup of Plaintiffs and class members.

40. Apple benefits immensely from a ranking system that favors their own rival apps, according to the report. Some searches reveal "14 Apple apps before showing results from rivals." The report documents that Apple "holds [competitor apps] to a different standard" than its own apps, which is precisely what happened to Plaintiff Coronavirus Reporter, and other class members. Such ranking unfairness has directly harmed Plaintiffs and class members.

41. Described is Apple's history of "closely monitoring the success of apps in the App Store, only to copy the most successful." Apple "takes other companies innovative features," which was the case with Coronavirus Reporter and other Plaintiffs. In sum, Plaintiffs and class members have experienced such anti-competitive behavior as described in the report.

42. The House report has an entire section devoted to Apple's "excluding rival apps." A well-known case of Apple's exclusion of parental control and Screen Time apps is described. One developer is mentioned who invested almost $250,000 in a parental control app, only to be told by Apple that this category of apps is disallowed. This pretextual, self-serving exclusion is directly analogous to Apple's exclusion of all startups from contributing to the COVID effort. Many class members of suffered the same fate, resulting in thousands of person-years and tens of billions of dollars of damages.

43. The report describes how apple has "absolute discretion" in approving apps, resulting in "complete tyranny." Just as Plaintiffs have asserted their heartbreaking experiences being lied to by junior Apple app store reviewers, the House Report goes even further. It says "different reviewers" interpret same apps "differently" with "intentionally…vague" guidelines that consist of "moving goal posts" and "unwritten rules." The report describes the frequent delays of weeks or months (which *Coronavirus Reporter* experienced) as "insufferable."

44. The Subcommittee exposed reports that Apple appointed two App Store employees to navigate the waters for Chinese firm Baidu, effectively giving them preferential treatment. Described is CEO Mr. Tim Cook's denial of preferential treatment, followed

by seemingly incontrovertible evidence the Subcommittee uncovered that indeed Mr. Cook did seek to favor the Chinese firm. As noted, Coronavirus Reporter and other Plaintiffs never received such hand-holding for their critically important apps.

45. The Subcommittee findings re Apple's anti-competitive behavior are hereby asserted by Plaintiffs and class members.

### Lead Plaintiff – Coronavirus Reporter Facts

46. At the time Plaintiff Coronavirus Reporter submitted their app to the App Store, there were zero coronavirus-specific apps on the United States App Store. A keyword search for COVID or Coronavirus yielded no results.

47. Their nimble team allowed them to create the first COVID app by a world renowned researcher, and what would have been the first COVID app on the App Store. The team included NASA's former Head Cardiologist, as well as a front-line Emergency Room physician and a Dartmouth trained computer scientist who personally developed apps used by half a billion users. Dr Roberts had full and final authority over all functionality of the medical app, as Chief Medical Officer of Coronavirus Reporter. In short, Coronavirus Reporter was developed by a world-class medical team with specific area expertise necessary and appropriate to combine health care epidemiology research with large-scale data operations. This combined expertise would allow this startup COVID app to be first-to-market.

48. The Coronavirus Reporter app was developed in February 2020. The app team, and the application they developed, was a reasonable application, and, most importantly, was ready for deployment when COVID was just arriving in the United States. The Coronavirus Reporter app, had it been allowed, would have provided useful

bioinformatics data, and provided a medium for free information exchange among United States citizens and COVID patients.

49. As such, functionality and early availability of Coronavirus Reporter would in all likelihood have prevented substantial morbidity and mortality. Expert analysis will be presented at jury trial showing that Apple's refusal of Plaintiff's app caused no less than two-thousand deaths in the United States.

50. The app provided both informal contact tracing, and pandemic situational awareness. This was implemented using a familiar and intuitive geolocation screen to report symptoms and view nearby outbreaks.



51. Little was known about COVID symptoms at the time, and the app was meant to develop with nimbleness and plasticity as situations emerged. In other words, the same skills Coronavirus Reporter employed to have the first COVID app, would allow for many future-improved versions that could advance epidemiological study of the pandemic.



52. The app sought user reported symptoms and COVID related questionnaire items. The public demanded this information that simply wasn't yet available from mainstream medical institutions. In other words, a social media/crowdsourced app provided a useful tool for pandemic situational awareness.



This app allows for community reporting of symptoms related to the novel coronavirus. The map view allows you to quickly see 'hot zones' of fever & symptom outbreaks reported by other app users. Users may also report school/work closures and self-quarantine status. Your profile report submission allows you to share valuable data with other users and epidemiology researchers to better understand this rapidly emerging health concern. This app is designed to provide public transparency of an evolving pandemic that is currently unavailable from other sources. Specifically, the true infection incidence rate of COVID-19 is unknown as many with mild symptoms are not registered by public authorities and hospitals. Additionally, there are shortages in lab test kits globally; Vice President Pence confirmed today that the United States has such a shortage. The COVID-19 Coronavirus appears to have originated in Wuhan, China in late 2019. Official estimates place the number of infections just short of 100,000 individuals and 5000 fatalities as of



53. Apple rejected Coronavirus Reporter on March 6, 2020, knowing apps from large institutions and strategic partners were in the pipeline but not yet ready. Apple specifically strategized to prevent the Coronavirus Reporter app, and *all* COVID startup firms, from setting a precedent or amassing a user base, which could jeopardize its own

pipeline and/or the first-mover advantage of desirable institutional partners of a monopolistic trust.

54. In the weeks following the initial rejection, with knowledge of Coronavirus Reporter's correspondence, Apple broadened the App Store requirements for a COVID app from insurance companies to any healthcare company with deep-rooted credentials. In other words, Apple barred startups from helping with the COVID pandemic, favoring large institutions.

55. Medical history is plentiful with examples of startups that revolutionized medicine. In his CNBC interview, Dr Roberts cited that "Penicillin was invented by a startup, it was a two person effort. Thankfully Apple wasn't in a position to block the invention of penicillin."

56. Despite expanding the App Store guidelines to any healthcare company, Defendant Apple denied the appeal and permanently disallowed the app on March 26, 2020. Apple internal discussions with its own partners, at the time, were already discussing their own proprietary COVID app. Apple was also looking to form partnerships with other leading institutions to develop COVID apps, that would further cement Apple's own monopolistic trust and medial endeavors. Apple's CEO Tim Cook has widely stated that healthcare is a major focus in Apple's strategic growth. On January 9th, 2019, Mr. Cook stated that Apple's "greatest contribution to mankind" will be Apple health care products. Blocking well established medical leaders from contributing to a pandemic raises serious questions that within the scope of antitrust law that shall be elucidated in this complaint.

57. Apple's twenty-day delay in assessing Dr Roberts' deep credentials suggests they struggled internally with the matter. Ultimately, Apple decided it would rather selectively

choose apps that fit its own goals, even if that meant forbidding a world renowned doctor from distributing his scientific work product.

58. We assert this is the first time in history a corporation was able to prevent a Professor of Medicine and award winning inventor, who had saved countless lives through his MBCK discovery, from contributing to an emergency pandemic history.

59. Indeed, Apple did knowingly and willfully prevent the inventor of MBCK from publishing a COVID app.

60. Defendant Apple knowing and willfully prevented Dr Roberts, inventor of a heart attack test used by millions, from assisting internet users during the early days of the pandemic. They knew, or should have known, that curtailing such expert assistance could have caused increased incidence and mortality due to COVID-19.

61. Indeed, blocking all startups from assisting with COVID app development likely cost lives. The flagrant Sherman Act violation seriously, dangerously, and recklessly constrained competition – here , much needed medical innovation.

62. Apple's willful denial of Dr Roberts' medical app, and other startup COVID apps, was directly assented to by key Apple leadership, including Mr. Cook and/or one of his delegates. These leaders willfully blocked an app that would have saved lives, according to their own research in conjunction with Oxford(see below).In doing so, Apple disregarded long-established medical social norms to an extent that was breathtaking.

63. Apple's App Review Board did not possess anyone with better COVID insight or credentials Coronavirus Reporter's Chief Medical Officer, though Apple acted as if they did have some sort of superior knowledge.

64. Said Chief Medical Officer created work-product, the app, that could have benefitted millions. Apple used arbitrary and capricious standards to prevent that benefit from being made reality.

65. Apple is a monopoly as defined by the Sherman Antitrust Act.

66. Apple has the ability to, and has in the past, restrained legally permissible, reasonable internet trade when it blocked Coronavirus Reporter and Unnamed App #1, and many other COVID startup apps.

67. Apple possesses vast userbase studies. Consumer willingness to pay and ability to pay studies have been a focus of Apple, Inc. Included in these studies, are evidence of the barriers and difficulties their users would face in accessing the internet without their Apple device. For example, a user who purchased a $1000 iPhone on a financing plan may not have the financial means to access the internet with an alternate device. Apple has substantial investments in cost-analysis literally tracking every penny its users does and can spend. From these vast economic studies, Apple knows it holds monopoly like power over many users' ability to exit the Apple ecosystem and access the internet through other means. Apple should produce all such economic data, under FRCP discovery rules, should they purport no such monopolistic controls exist.

68. Plaintiffs are startups that have no income stream, because of Defendant's illegal actions. Apple, on the other hand, is the world's largest corporate entity and has appointed a law firm to represent this case where the average partner brings in over $4 million a year in revenue. To assist in the enforcement of the Sherman Act, we have requested help from the United States Attorney for the prosecution of Apple's anticompetitive behavior.

Likewise, Plaintiffs are in the process of initiating European Commission complaints that may interact with this case progression.

69. In June 2020 Apple publicized that, in light of complaints from developers of unfair rules, they would be allowing developers to challenge the App Store rules. Previously, Apple said developers could only challenge the factual findings of an app review, within the rules guidelines. But in fact, Apple had allowed Plaintiff Coronavirus Reporter to challenge the rules as it did in March 2020. Nonetheless, the rules change did not benefit the company, as Apple still found an arbitrary and/or capricious interpretation of the new rules.

70. In short, Apple's "self-policing" of its monopolistic Developer Agreement was a sham. It had no tangible, real impact on Apple's stronghold of the App Store and free and open internet access. *See https://www.cnbc.com/2020/06/22/apple-will-provide-a-way-for-app-makers-to-challenge-app-store-rules.html*

71. Defendant Apple stated the reason for denial was that a) Coronavirus Reporter was not a recognized healthcare entity, and b) the "user-generated data wasn't vetted by a reputable source."

72. In so doing, Apple was saying that citizens shouldn't be allowed to post on a private application their symptoms of COVID, and that Dr. Roberts' app model was inappropriate.

73. In so doing, Apple was infringing upon the right of Coronavirus Reporter, as well as ordinary citizens and COVID patients to engage in free, unrestricted commerce and information exchange on the internet.

74. Defendant Apple allowed at least two competing COVID apps from large institutions approximately three months after Coronavirus Reporter's app was ready. This caused Coronavirus Reporter to lose the valuable first-mover advantage of an internet app.

75. Apple allowed a similar British app from Guy's St Thomas' hospital to enter the App Store. Although it was sponsored by an institution, the app was primarily the work-product of several individuals, as was the Coronavirus Reporter app. This app quickly achieved millions of users a day. Had Coronavirus Reporter been rightfully approved, the app would have received a significant share of the volume that went to competitor apps.

76. In a second example of their breathtaking arbitrary standards, Apple did approve a fledgling Florida startup's COVID app. As the House Report determined, often Apple interprets its own guidelines incorrectly or inconsistently. As other Unnamed Apps have experienced, often cronyism takes place where Apple allows their own friends and app teams known to them to violate their own guidelines, which appears to be what happened in this case of a startup being permitted to launch a COVID app with a Chief Medical Officer that did not possess the qualifications of Dr Roberts. That startup did not have a large-scale data computer scientist from Dartmouth, as did Coronavirus Reporter, which had written apps that served hundreds of millions users.

77. Allowing the aforementioned competing apps, but disallowing Coronavirus Reporter, and most all other COVID startups was intentional, flagrant restraint of trade.

78. Apple's contact-tracing app was developed in conjunction with another large technology company.

79. Apple and that company, combined, effectively provide internet access to the entire United States population.

80. By disallowing Coronavirus Reporter and partnering with a rival to provide a COVID app that ultimately failed its objectives, Defendant Apple's monopolistic practices caused a permanent loss of valuable epidemiological bioinformatics data. This loss spanned some three months, the time during which no competing apps existed in the US marketplace. Valuable epidemiological data was forever lost during that duration.

81. Access to the national internet backbone is theoretically possible without using Apple or Google products, such as with a generic UNIX web browser.

82. In practicality, many individuals, especially elderly and children, only learn how to access the internet using a friend or relative's Apple device. Additionally, GPS location data does not typically exist on a generic web browser. As such, economically efficient geolocation of symptoms was only possible using either Apple's smartphone, or its rival.

83. Native apps are favored by customers by almost 90% over web browser apps. Native apps provide more functionality, which would be helpful with a Covid app. As such, "smartphone enhanced internet commerce and information flow" requires access to the app SDK, rather than mere web browser experience.

84. As such, Apple is a *de facto* monopoly of access to the national internet backbone, or at least, the smartphone enhanced functional internet backbone.

85. There exists tens of millions of individuals in the United States who do not know how to access the internet without using an iOS device.

86. These individuals rely upon access to the internet to perform critical commerce activity, engage in protected free speech, and obtain lifesaving medical advice and treatments.

87. A third-party developer such as Coronavirus Reporter and Unnamed App #1, seeking to help facilitate those above enumerated activities, is required to sign Apple's Developer Agreement and ask permission from Apple to distribute their application.

88. There was no reasonable grounds for Apple to deny the Coronavirus Reporter app, Unnamed App #1, and all other COVID startups for public distribution.

89. Apple has an App Review Board that decides which apps it will permit on the App Store.

90. The App Review Board has denied substantial numbers of legitimate, reasonable applications, representing thousands of man-years of work and labor, collectively.

91. Plaintiffs Unnamed Apps #1 - #5, and all class members, each have a unique app and unique story to tell. A common thread is that each app was denied, either in outright fashion, or via ranking suppression, on the basis of pretextual excuses by Apple.

92. These pretextual excuses are exemplified in the House report, as well as academic papers such as the Yale SOM Thurman Arnold Project's Digital Platform Series on "The Antitrust Case Against Apple"(*Kotapati et al*, May 2020) which is hereby incorporated. The Yale SOM paper documents the pretextual excuses Apple used to block rival apps.

93. Unnamed Apps #1 - #5 have faces nearly identical experiences to that documented by the House report and *Kotapati et al*.

94. Unnamed App #2 created an edutainment financial technology application which required absolutely no money or risk from the users. Apple barred the app for creating too much financial risk to users, and other plainly vague, false pretenses.

95. Unnamed App #3 innovated an information research tool and ranked highly on the app store. Apple suppressed its rankings and replaced it with an Israeli app that functioned nearly identically. Apple then attempted to ban Unnamed App #3, citing, like the

aforementioned Screen Time case, vague, unsubstantiated privacy concerns. Apple favored a crony in Israel, upon information and belief, when it replaced this highly ranked with a copycat.

96. Unnamed Apps #4 & #5 were platform marketplaces for telemedicine. App #4 was rejected because it used outside payment processors to charge doctors 2% commissions on consultations. Apple forced the developer to use IAP, and hence, a 30% commission. Doctors using the platform would receive less than two-thirds of their billing amount. The developer's platform was rendered useless by this excessive economic rent.

97. Plaintiffs, the app team individuals, have personally witnessed the inappropriate rejection of five apps representing eight man-years, and asserts claims herein for all illegally restrained marketplace violations. The exact number of man-years illegally wasted by Apple, possibly tens of thousands, will be sought under early FRCP discovery rules.

98. All of the aforementioned examples restricted output, quality, and innovation in the downstream App market for smartphone users. We expect many more stories to emerge as Plaintiff's first discovery request to Defendant Apple will be a list of every rejected app team and supporting documentation.

99. When the App Review Board denies an app, they assign this to a junior staff member who must make the unpleasant call to a developer team to inform them that their team's work of months or years is being denied access to the global internet backbone.

100.     These are often difficult conversations that understandably cause distress for both parties. Upon information and belief, Apple's junior App Review Board employees (who are only known to the developers on an informal first name basis) suffer considerable

psychological distress from repeatedly shooting down the dreams, and years of work-product of the app developers.

101.    In short, Apple has junior App Store employees do their "dirty work" of unreasonably disallowing perfectly legal and legitimate apps that meet all standards and requirements.

102.    The apps are, in fact, disallowed to foster Apple's monopolistic goals, rather than to protect the public from low-quality or illegal applications. Upon information and belief, Apple routinely employs cronyism when it allows one developer's app, but disallows similar apps from other developers. This is particularly evident and distressing to the aforementioned junior App Reviewers, who are aware they are misleading and/or lying to the other developers.

103.    This well-known issue within the company is one reason Apple is aware that antitrust laws will, at some point, challenge the *status quo*. On February 22, 2021, Apple's CEO Tim Cook notified Apple Shareholders that antitrust compliance is a future risk to Apple's profits. Included in the memorandum is new language: "The Audit Committee and Board regularly review and discuss with management Apple's antitrust risks. Apple's Antitrust Compliance Officer is responsible for the development, review, and execution of Apple's Antitrust Compliance Program and regularly reports to the Audit Committee. These reports cover, among other matters, the alignment of the program with Apple's potential antitrust risks, and the effectiveness of the program's design in detecting and preventing antitrust issues and promoting compliance with laws and Apple policies."

104.     Discovery will demonstrate that Apple is aware of numerous instances, such as Coronavirus Reporter, where they violated antitrust law by disallowing reasonable use of their devices and App Store, restraining interstate commerce.

105.     The Electronic Frontier Foundation (EFF) is a non-profit that endeavors to maintain free computing practices. The EFF seeks donations from individuals to support claims like this; The EFF is funded to support the rights of computer developers in the face of monopolistic barriers. Plaintiffs have petitioned to EFF for assistance with this lawsuit, but EFF has not yet provided any assistance.

106.     Historically, most internet applications were free and open-sourced, under the MIT/GNU software licensing paradigm. In the past decade, Defendant Apple has drastically changed the free, open internet to one of massive, trust-like corporate profits and control.

107.     Apple has internal records that document numerous examples of how their market control, technology, and/or restrictive policies have willingly and unwillingly damaged smaller entities and individuals. Under FRCP, these records shall be produced by Apple.

108.     As of the week of filing, at state governments and multiple friendly foreign governments (Australia, Canada) have announced legislation meant to prevent Big Tech companies like Apple from abusing their monopoly powers. As discovery will show, Apple is aware of numerous yet-announced government inquiries and preliminary legislation meant to address the type of wrongs Apple inflicted on Plaintiff.

109.     Apple enjoys, nonetheless, an esteemed position in society which is reflected in its $3trillion valuation. Antitrust Law, in theory, seeks to balance the cost to society of regulating a top performing, well admired company's value while assisting smaller

companies harmed by the monopoly. In abstract terms, a sliding scale exists where antitrust enforcement saving thousands of companies the size of Plaintiff is weighed against the losses incurred by regulating a monopoly (Apple). In practicality, properly effected Antitrust regulation vastly benefits society by rescuing the value of smaller companies while allowing the monopoly to continue a legal value creation path. There exists no reason in theory why Apple could not also benefit from ceasing to engage in the anti-competitive acts describe herein, further increasing its value. For example, Apple could implement Plaintiffs' suggestion of an independent App Court for due process, and forego their divine right of kings approach. They might even profit as more developers innovate, and consumers are better able to enjoy their smartphone investment. Therefore, injunctive action to protect small entities does not, in theory, necessitate a zero-sum scenario at Apple's expense.

110.     At the very least, this plausible theory is part of an ongoing national (and global) discussion.

111.     By definition, this theory and underlying claims of this lawsuit are not frivolous.

112.     Apple falsely asserted these claims and stories of real loss by countless developers was frivolous in a recent pleading.

113.     Apple has not made any effort to retract their false statements, despite being notified to do so.

114.     Dr Roberts was interviewed by CNBC on January 28th, 2021 about Apple's refusal to publish his Coronavirus Reporter. His statements in that interview are asserted as true to the best of his knowledge and belief. In summary, he stated:

i. The app was designed to be a large-scale, supervised epidemiological study, the first of its kind in such an historic pandemic.

ii. He invented the MBCK gold standard screening test for heart attacks, used for over three decades. Thus he had particular experience to supervise such an immense screening effort.

iii. He was "taken aback," in his own words, when Apple announced they were refusing his app for lack of deep-rooted medical credentials.

iv. Dr Roberts discovered numerous heart attack genes, was CEO of a major Heart Institute, personally signed off on John Glenn's space flight, authored medical textbooks, and directed the Nobel prize committee for mathematics. In his words, if Apple said he lacked "deep rooted" credentials for a COVID app, who was safe from Apple?

v. To the extent Apple attempts to portray a startup as distinct from his own credentials, Roberts dismissed that with a historical perspective. Penicillin was invented by a "startup" with deep-rooted medical credentials, as were many of the most important inventions since the Industrial Revolution. In short, for Apple to claim an institution has some unique ability to contribute to medical science, that an individual startup lacks, is not historically accurate.

vi. Roberts asserted that society lost from Apple's refusal, in that critical epidemiological data was forever lost.

vii. Roberts brainstormed that the app might have helped him elucidate long term cardiac complications of COVID.

viii.  Roberts stated that, though he is not a lawyer, he doesn't feel Apple should be allowed to do what they did.

115.    Plaintiffs and their attorney hereby represent no less than half a dozen Sherman Act violating app rejections. Plaintiffs and their counsel seek expedited and prompt discovery of Apple "developer.apple.com" systems to identify other developers who have been victim to such wrongs by Apple, including app ranking suppression, inappropriate app disallowments, retaliations, excessive rent fees, and being subjected to false statements and harassment by the App Review team.

**Claim Theory**

**Apple is a monopolist in the market for iOS app and payment processing (IAP) distribution services.**

<u>The Market</u>

116.    Apple possesses monopoly power in the domestic and global market for iOS app distribution, and in the market/aftermarket for iOS app payment processing. Customers for each include app developers and consumers using iOS devices, and they exist as aftermarkets to iOS devices.

117.    In designing iOS and the iPhone, Apple was faced with a problem that previously plagued its desktop and laptop computers throughout the 1980s and 1990s. In that era, Apple took an almost entirely proprietary approach to its hardware and software. That approach, however, severely limited the scope of Apple's software offerings and put it at a decided competitive disadvantage against others, such as Microsoft and OEMs that used the Windows operating system, who took a much more open approach to software. Apple thus carved out only a very small, niche market share during that era, and in fact

almost went bankrupt as a result. Indeed, it was not until Apple relented and stopped trying to prevent third party developers from operating in its software application markets that its fortunes turned around.

118.     Guided by this historical and popularity or newly emerging app markets, Apple realized soon after introducing the iPhone that it needed to offer at least the appearance of broad choice of software to use on its new smartphone. This was particularly so because other companies—notably, Google, Microsoft, and Blackberry—were developing their own smartphones and had a more open history regarding third parties' ability to create and sell applications for their respective platforms. Apple therefore, as discussed above, introduced the App Store in July 2008 and thereafter actively tried to encourage the appearance of a robust market for iOS apps. Touting the choice and breadth of apps the App Store presumably enabled, Apple has consistently used the availability of third-party applications to fuel the demand for the iPhone and its iOS operating system. Indeed, Apple promoted the iPhone by heavily advertising third party applications and stating, "there's an app for that."

119.     Apple's efforts have succeeded to drive demand for its iOS devices, including the iPhone, in competition with devices running other operating systems. In the U.S. alone, consumers own nearly 200 million iPhones. All of those devices run only iOS applications.

120.     High switching costs prevent users from switching from one operating system to another operating system after they initially purchase a mobile device. These switching costs increase over time for a variety of reasons, including, among other things, the cost of the mobile device; the user's familiarity with the operating system and unwillingness

to learn a different operating system; the user's familiarity with apps on that operating system; the users' costs sunk into purchased applications that are not compatible with other operating systems, which is amplified by the restrictions on the App Store and the inability of App Store developers to communicate freely with their users; and the costs of hardware purchased to support the mobile devices utilizing that operating system. Moreover, switching costs for mobile devices—particularly for iOS devices, due to Apple's typically extreme practices—have increased dramatically in recent years with the advent of cloud computing.

121.     These high switching costs, which are not readily apparent to the vast majority of iPhone users before they purchase their devices, were nevertheless apparent to Apple early on. This led it to realize that it could make enormous additional profits if it exerted complete control over the various aftermarkets into which iPhone users were locked once they purchased their device.

122.     Users who want apps on their iOS devices *must* download those applications from Apple's iOS App Store app. By technological design and contractual restraint, Apple does not allow other third party services to distribute iOS apps. Furthermore, Apple has designed iOS in such a way that no iOS app distributor is available or largely even useable on iOS devices. In this way, Apple is significantly different than other companies. For example, in the Android operating system, Android users can download Android applications from multiple application marketplaces—including Google's Play Store, Amazon's Appstore, and Samsung's Galaxy Store. Apple takes multiple, active steps to prevent anything similar for iOS devices.

123.     App developers, who are also customers in the iOS app distribution market—because the app distributor(s) offer a service and product that facilitates locating, selling, and installing the developer's app—face a similar reality. The existence of other mobile device operating systems is meaningless to developers who program apps and in-app products for use on iOS devices, because it does not change the markets into which those apps are sold and developers cannot take a one-size-fits-all approach to app development.

124.     A move away from the iOS system would mean that a developer could no longer offer its iOS apps or in-app products to hundreds of millions of consumers, and the developer would have no substitute available, because it could not sell its iOS app into a different market for mobile apps, such as for the Android or Windows operating systems. Notably, Apple admits that it shuts out all competition from app distribution to iOS device consumers, ostensibly to protect its device customers from bad apps and malware. But herein lies a recurrent theme of pretextual excuses at Apple. Apple's smartphone competitors explicitly permit competing app distribution services, which shows that Apple's actions and justifications to the contrary are pretense.

125.     Apple also permits third party app distribution to its macOS-compatible devices. The Mac is a part of a safe, longstanding computer ecosystem that has tens of millions of loyal users. Bad apps and malware never plagued the Mac ecosystem, despite their open app distribution framework. Brick and Mortar distribution outlets, and even web-based distribution outlets have never resulted in significant safety or quality issues, at least not so much as to deter one from using the Mac ecosystem. Apple's double-standard cannot be more evident, when one compares the Mac and the iOS ecosystems.

126.    In a broader definition, the market is the entire interstate, smartphone enhanced commerce and information flow transacted via the national internet backbone. Smartphone enhancements currently include altimeters, barometers, gyroscopes, cameras, fingerprint sensors, GPS, microphones, EKG readers, pulse oximeters, and even potentially blood sugar monitors. Consumers essentially purchase a bundle of sensors from Apple, with an operating system (iOS) that creates an intuitive interface that connects these sensors to the national internet backbone. Consumers have an expectation, and a right, to benefit from the network effects (i.e. critical mass and/or economy-of-scales) of interacting with fellow smartphone users throughout the country. Such interaction is not possible through a web browser alone. These sensors require sophisticated API and SDKs not accessible though bare-bones TCP/IP internet protocols. In other words, Apple's iOS is the toolkit that allows consumers to benefit from the hardware they paid for.

127.    In the case of Coronavirus Reporter, restricting these enhanced health sensors that consumers paid for, or blocking them from a research cardiologist such as Dr Roberts, is particularly unsettling. Apple exclusively controls approximately 65% of the smartphone enhanced interstate communicate pathways, as defined in this market. Plaintiffs reserve the right to apply either of the aforementioned market definitions interchangeably, as appropriate for different apps and different claim scenarios.

**Alternatively, Apple is an attempted monopolist in the domestic and overseas market for iOS app and IAP distribution services.**

128.    Alternatively, for the foregoing reasons, Apple is an attempted monopolist in the market for iOS app and IAP distribution services. Given that the facts alleged amply

support a finding that Apple has always maintained monopoly status in this U.S. market, *a fortiori* they support a finding that Apple is attempting to monopolize the distribution-services market by improper means.

129.     In our broader market definition of smartphone-enhanced internet backbone control, Apple's threshold of approximately 60% is sufficient to sustain an attempted monopolization theory.

**Alternatively, Apple behaves as a monopsonist retailer, or attempted monopsonist retailer, of iOS apps and related digital products.**

130.     Alternatively, by requiring that it be the sole retailer of iOS developers' digital products, Apple acts as a monopsonist, or attempted monopsonist. A monopsonist is a buy-side monopolize. The circumstances and effects are essentially the same as with monopoly or attempted monopoly: by Apple's behavior as alleged herein, Apple uses its monopsony power as the sole retailer-distributor for iOS apps and IAP to pay iOS developers below the price they would obtain in a competitive market for their products. The effect is the same as if Apple, in a wholesale-retail model, had depressed wholesale prices by way of its anti-competitive market power and behavior.

131.     Here price may be the app cost itself, the IAP price, or the net proceeds relayed to the developer from sponsorships, partnerships, advertising revenue, and/or brand goodwill. Apple's own apps generate sponsorships, partnerships, advertising revenue and goodwill for Apple. Ad revenues, in particular, have a limited supply: there is a finite number of ad time each iOS user can view each day. By restricting competition for its own apps and those of its monopsony cronies, strategic, and otherwise chosen partners, Apple illegally diverts profits away from the developer apps.

**Apple's practices with respect to the App Store further restrain and injure competition in the U.S. market for iOS app and in-app-product distribution services, where already there are high barriers to entry.**

132.    Apple's unlawful practices in aid of establishing and maintaining its monopoly restrain and injure competition in the domestic market for iOS app and in-app-product distribution services, where already there are high barriers to entry. Even were it not for Apple shutting out competitors by design, market-participant hopefuls would still need the resources to build and maintain the app store client for iOS devices, to program and maintain the requisite software and algorithms going forward, to advertise the client and the steps needed to install it, among other barriers. The European Commission has concluded that there are high barriers to entering the market for app distribution via app stores.

**Apple's unlawful practices harm competition, developers, and consumers of apps and in-app products, too.**

133.    Apple's monopolistic practices in the U.S. market for iOS app and in-app-product distribution services harm competition by depressing the output of distribution transactions. Additionally, these practices harm iOS device consumers by robbing them of innovation and choice. Apple's distribution charges are so high that undoubtedly they keep developers out of the App Store; why develop an app or platform that will be have economically inefficient rents? Developers are arbitrarily blocked from developing apps, under constantly changing, arbitrary guidelines that often exempt Apple's cronies. Likewise, these practices harm consumers owning iOS mobile devices because they rob them of more other apps that might be truly useful, fun, or innovative. Apple's minimum

price harms consumers, as a developer cannot offer an app for $0.49, for example. Additionally, the fact that apps are not discoverable due poor organization of the iOS app store hurts developers and buyers of iOS apps and in-app products as well. Unquestionably, Apple's anti-competitive mandate that it be the sole provider of distribution services, and that it run the lone iOS app store, hurts competition greatly.

**Apple harms consumers and competition by depressing output.**

134.     Evidence shows that consumers of app-store products are quite price sensitive. Apple's high transaction fees, and the existence of minimal fees, inhibit sales of products sold via the App Store. Thus, distribution transactions are inhibited as well. In other words, Apple's fees depress output.

**Apple's behavior stifles innovation.**

135.     Apple's abusive monopoly also stifles innovation in apps—another way it hurts competition generally. Other vibrant app stores would mean more places for featuring apps. With so many apps available on the market, massive volumes of product can and does get lost in the App Store. Consumers, as well as developers and competition generally, would benefit from other venues that would surface good, new product and encourage the development of yet more and better apps— all of which would engender more output in the market here at issue.

**Apple harms developers by denying them the opportunity to choose other means to get paid for their work.**

136.     Apple's aggressive, anti-competitive behavior diminishes the choice offered by endeavors that compensate developers of free apps through other means, such as ad revenue and sponsorships. *Cameron et al*(Exhibit B) explains in detail the failure of

Amazon Underground, a free app marketplace, which stemmed from Apple's anti-competitive practices.

137.     Plaintiffs were damaged through lost opportunities to get paid for their work. Plaintiffs created apps of substantial value, but were paid a price of zero by Apple – in the cases of disallowance or ranking suppression. As a monopsonist, Apple had full say in setting this zero price, which stifled innovation and excluded rivals. Alternatively, as a monopolist, Apple underpaid developers by 30% and excluded rivals. In the case of Coronavirus Reporter, either monopoly or monopsony theory applies in that prices were artificially manipulated by Apple, Apple benefitted through their own apps, and the consumer lost. For example, Coronavirus Reporter may have offered a free app, sponsored through partnership with Pfizer or Moderna for vaccine information. For users who wanted a truly independent app only representing Dr. Roberts medical expertise, a minimal $0.49 might have been offered. However, Apple sets a minimum price tag of $0.99, which is too high to charge someone for a pandemic relief app. Downstream benefits to app publishers include brand goodwill, partnerships (e.g. vaccine producers, physician networks), and potentially ad revenue. Apple's own apps benefit from these, especially brand goodwill. As a monopsonist buyer, when Apple blocked an app like Coronavirus Reporter, it effectively paid the developer zero, reaping the brand goodwill and finite ad revenue for its own rival apps.  As a monopolist distributer, Apple held a 30% excessive rent, charged developers $99 unnecessarily, and excluded competition – here, all startup COVID apps. These are illustrative examples only, but suggest likely and common scenarios that applied to all Plaintiffs and class members.

**Apple harms consumers of its distribution services by way of supra-competitive pricing and other pricing mandates.**

138.     There is no good, pro-competitive, or otherwise justified reason for Apple's 30% transaction rate, which it has maintained since the opening of its App Store. Rather, this unnatural price stability, under the circumstances alleged herein, is a sure sign of Apple's unlawful acquisition of monopoly power and the abuse of that market power.

Nor do the facts and circumstances of app and in-app product distribution give rise to any pro-competitive justification for Apple's contractual terms requiring $.99 minimum pricing for paid apps and in-app products, or its end-in-$.99 pricing mandate. These, too, are abuses of Apple's improperly obtained monopoly power.

**Apple has admitted that the Plaintiff class has standing in this lawsuit.**

139.     Apple admits that iOS apps are distributed solely through its App Store. Ostensibly, this is so that it can review them "for malware and similar issues," though this is certainly something other distributors could do.

140.      According to Apple, "[d]evelopers are the ones who purchase distribution [from it], not consumers."

141.     As between consumers of apps and in-app products vs. consumers of its app and in- app-product distribution services, Apple admits that distributors have antitrust standing. In briefing to the Ninth Circuit, Apple has stated: "The software developers who are directly impacted by Apple's 30% commission absolutely would have antitrust standing to bring a monopolization case, if they wanted to . . . ." "App developers have standing under *Illinois Brick* to argue whatever they want because they are direct purchasers of distribution services from Apple, and if they want to argue, for example,

that their consent [to Apple's fees] was coerced by Apple's market power, they can." With respect to *Illinois Brick* issues, "[a]pp developers are the ones who have antitrust standing to bring any claim about Apple's 'monopolization' of Apps distribution."

142.     Similarly, in briefing to the U.S. Supreme Court, Apple has stated: "The developer is also the first person to bear the alleged overcharge on the allegedly monopolized service, and by that definition also the 'direct purchaser.'" According to Apple, "it is plainly the iOS developers—the

143.     Finally, as Apple told the Supreme Court, "the first party that directly pays an overcharge"—here, the developers, per its own admissions—"has a complete and undiluted cause of action for the entire overcharge." According to Apple, Supreme Court precedent mandates that "'the overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party" injured in his business or property" within the meaning of the [Clayton Act].'"[1] Apple stated: the Supreme Court's prior "decision in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), gives developers a claim for 100% of any overcharge." Per Apple, "*Hanover Shoe* 'concentrate[s] the full recovery for the overcharge' in the direct purchaser's hands."

144.     There is simply no doubt in Apple's view that developers, as opposed to app and in- app product consumers, are the proper plaintiffs in a suit regarding its iOS distribution-service fees. As it has told the Supreme Court, "[t]here is no 'next best plaintiff' theory that permits indirect purchasers [such as consumers of the apps and in-app products themselves] to secure their own standing by undermining the claims of those who first bear an alleged overcharge"—here, the iOS developers who are the plaintiffs and putative class members. (See *Cameron v. Apple* Complaint, pages 30-32)

145.     But even without these admissions, the Supreme Court of the United States recently recognized developer standing in this matter. As the Court put it with respect to a monopsony case, which plaintiffs plead in the alternative here:

> And it could be that some upstream app developers will also sue Apple on a monopsony theory. In this instance, the two suits would rely on fundamentally different theories of harm and would not assert dueling claims to a "common fund," as that term was used in *Illinois Brick*. The consumers seek damages based on the difference between the price they paid and the competitive price. The app developers would seek lost profits that they could have earned in a competitive retail market. *Illinois Brick* does not bar either category of suit.

146.     The antitrust injuries alleged herein, including harm to developers of iOS apps and in- app products, competition, and consumers of iOS devices, have occurred in the U.S. market for iOS app and in-app-product distribution services (or, alternatively, in the U.S. market for iOS app and in- app-product retailing services). Apple monopolizes this market (or acts as a monopsonist retailer) as alleged herein.

147.     Due to the incompatibility of Apple's iOS with Google's Android OS, as well as the incompatibility of iOS and Android OS apps as alleged herein, Google Play offers no competition to, and is not a substitute for, the App Store. Nor do other distribution service providers such as Amazon or Microsoft, which also do not provide distribution for iOS apps and in-app products (and which Apple bars from competing in any event). Even with a small but significant—or large—price increase, whatever the duration, plaintiff developers have nowhere to go to serve the iOS market for which they have developed apps and in-app products—they need iOS distribution services. And Apple is the sole, monopolistic provider thanks to its deliberate exclusion of competition.

148.     Furthermore, even if a developer were to seek lower prices elsewhere, he or she would not find them in Google's parallel store, Google Play. Thanks to having split the world neatly between them, Google's fees are as high as Apple's.

149.     Alternatively, even if one were to consider *all* distribution services for any apps or in- app products, whatever the underlying operating system, or whatever the platform or devices, Apple's distribution services for iOS apps and in-app products would form a distinct relevant sub- market.

150.     Apple's restraints on competition directly impact the U.S. market for iOS app and in- app-product distribution services as alleged herein.

151.     As it has admitted, Apple is a direct seller of iOS distribution services to iOS developers.

152.     Plaintiffs seek relief on behalf of themselves and other developers. Insofar as the App Store may be or is a two-sided platform, lower prices to developers for distribution services (or for retail commissions) would not lead to any discernible negative indirect network effects under the circumstances described herein. For example, unlike with respect to credit-card transaction platforms, lower fees or prices would not mean less money available to pay rebates or rewards to consumers. To the contrary, Apple does not share its transaction fees with consumers. Here, Apple's restraints do not help to establish or enhance participation *inter se* developers and consumers, nor do they help to prevent erosion in participation. In fact, Apple can point to no considerations that countervail the propriety of the monetary and injunctive relief that plaintiffs seek.

153.     Plaintiffs bring this proposed class action pursuant to Fed. R. Civ. P. 23(b)(1), (2), and (3).

154.     Plaintiffs bring this action on behalf of themselves and the following nationwide class, for monetary and injunctive relief based on violations of the Sherman Act:

> *All U.S. developers of any Apple iOS application that was excluded through disallowance and/or ranking suppression on Apple's iOS App Store.*

155.     Not included in this proposed class is the defendant; defendant's affiliates and subsidiaries; defendant's current or former employees, officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

156.     Plaintiffs also bring this action on behalf of themselves and the following nationwide class, for monetary and injunctive relief based on violations of the Sherman Act:

> *All U.S. developers of any Apple iOS application or in-app product subject to a 30% sales commission Apple's iOS App Store.*

157.     Not included in this proposed class is the defendant; defendant's affiliates and subsidiaries; defendant's current or former employees, officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

158.     Plaintiffs also bring this action on behalf of themselves and the following nationwide class, for monetary and injunctive relief based on violations of the Sherman Act:

> *The millions of U.S.-based iOS developers who were required to sign the DPLA and pay Apple $99 simply to access the 60% of the population that uses smartphone enhanced services (i.e. iOS) over the national internet backbone.*

159.     Not included in this proposed class is the defendant; defendant's affiliates and subsidiaries; defendant's current or former employees, officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

160.     **Numerosity:** The exact number of the members of the proposed classes is unknown and is not available to the plaintiffs at this time, but upon information and belief, supported by Apple's past statements, the classes will consist of at least thousands of members such that individual joinder in this case is impracticable.

161.     **Commonality:** Numerous questions of law and fact are common to the claims of the plaintiffs and members of the proposed classes. These include, but are not limited to: a. Whether there is a U.S. market for iOS app and in-app-product distribution services; b. Alternatively, whether there is a U.S. sub-market for iOS app and in-app-product distribution services; c. Whether Apple has unlawfully monopolized, or attempted to monopolize, the U.S. market for iOS app and in-app-product distribution services, including by way of the contractual terms, policies, practices, mandates, and restraints described herein; d. Whether competition in the U.S. market for iOS app and in-app-product distribution services has been restrained and harmed by Apple's monopolization, or attempted monopolization, of that market; e. Alternatively, whether Apple has behaved as a monopsonist, or attempted monopsonist, retailer of iOS apps and in-app products as alleged herein; f. Whether plaintiffs and members of the proposed classes are entitled to declaratory or injunctive relief to halt Apple's unlawful practices, and to their attorney fees, costs, and expenses; g. Whether plaintiffs and members of the proposed classes are otherwise entitled to any damages, including treble damages, or restitution, and to their

attorney fees, costs, and expenses related to any recovery of such monetary relief; and h. Whether plaintiffs and members of the proposed classes are entitled to any damages, including treble damages, or restitution incidental to the declaratory or injunctive relief they seek, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief.

162.     **Typicality:** Plaintiffs' claims are typical of the claims of the members of the proposed classes. The factual and legal bases of Apple's liability are the same and resulted in injury to plaintiffs and all of the other members of the proposed classes.

163.     **Adequate representation:** Plaintiffs will represent and protect the interests of the proposed classes both fairly and adequately. They have retained counsel able to engage, and experienced with, complex litigation. Plaintiffs have no interests that are antagonistic to those of the proposed classes, and their interests do not conflict with the interests of the proposed class members he seeks to represent.

164.     **Prevention of inconsistent or varying adjudications:** If prosecution of a myriad of individual actions for the conduct complained of were undertaken, there likely would be inconsistent or varying results. This would have the effect of establishing incompatible standards of conduct for the defendant. Certification of plaintiffs' proposed classes would prevent these undesirable outcomes.

165.     **Injunctive and declaratory relief:** By way of its conduct described in this complaint, Apple has acted on grounds that apply generally to the proposed classes. Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the classes as a whole.

166. **Predominance and superiority:** This proposed class action is appropriate for certification. Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the proposed classes could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

## V.    CAUSES OF ACTION

### COUNT I (SHERMAN ACT  15 U.S.C § 2)
### VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION/MONOPSONY

167.     Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

168.     Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide class described above.

169.     The relevant market is the U.S. market for iOS app and IAP distribution services, or for retailing iOS apps and in-app products. Alternatively, the relevant market is the U.S. retailing of iOS apps and related digital products.

170.     Apple has gained and maintains monopoly power in the relevant market (or sub-market) by improper and unlawful means. Alternatively, Apple, as the sole U.S. retailer of iOS apps and in-app products, and, upon information and belief, a seller of a significant sum of in-app subscriptions, acts as a monopsonist in the relevant market.

More specifically, Apple has willfully acquired and maintained such power by its patently exclusionary conduct, including its refusal to allow iOS device owners to purchase iOS apps and IAP other than mandating that iOS developers who sell through the App Store cannot sell their apps though any other means that are meant to reach iOS device consumers. Each of these instances of exclusionary conduct is also directly exclusionary in the U.S. market for iOS app and IAP distribution services, or for retailing iOS apps and related digital products, because they ensure that iOS app developers must use Apple's distribution services to reach iOS device owners.

171.    For the reasons stated herein, substantial barriers to entry and expansion exist in the relevant market.

172.    Apple has the power to exclude competition in the relevant market and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, in order to maintain and expand its monopoly power in that market.

173.    Apple's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rivals in the U.S. market for iOS app and IAP distribution services.

174.    Apple has behaved as alleged herein to maintain and grow its monopoly in the U.S. market for iOS app and IAP distribution services, with the effect being that competition is foreclosed and that consumer choice is gravely diminished. So is innovation. Additionally, Apple has abused its market power by insisting on 30% transaction fees, minimum price fixing, and end-in- $.99 pricing as alleged herein.

175.    There is no business necessity or other pro-competitive justification for Apple's conduct. Apple's conduct has substantial anti-competitive effects, including increased

prices and costs, reduced innovation and quality, and lowered output and consumer choice.

176. Plaintiffs and the federal law class have been injured, and will continue to be injured, in their businesses and property as a result of Apple's conduct, including by way of overpaying for iOS app and IAP distribution services. Additionally, or alternatively, plaintiffs and the federal law class have suffered damages because they were underpaid by monopsonist Apple as a result of the Apple's conduct as described herein.

177. Plaintiffs and the federal law class also are entitled to injunctive relief to prevent Apple from persisting in its unlawful, inequitable, and unjustified behavior to their detriment, with such an injunction barring this anti-competitive conduct.

### COUNT II (SHERMAN ACT 15 U.S.C § 2)
### VIOLATION OF THE SHERMAN ACT – ATTEMPTED
### MONOPOLIZATION/MONOPSONY

178. Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

179. Plaintiffs bring this claim on their own behalf and on behalf of each member of the proposed nationwide federal law class described above.

180. The relevant market is the domestic market for iOS app and IAP distribution services. Alternatively, the relevant market is the domestic market for retailing iOS app and related IAP digital products.

181. Apple has attempted to monopolize the U.S. market for iOS app and IAP distribution services. Alternatively, Apple, as the sole U.S. retailer of iOS apps and IAP digital products, and, upon information and belief, a seller of a significant sum of in-app

subscriptions, is an attempted monopsonist in the relevant market. More specifically, Apple has willfully acquired and maintained market power by its patently exclusionary conduct, including its refusal to allow iOS device owners to purchase iOS apps and IAP other than through its own App Store; refusing to allow other app stores to be allowed on its devices; and mandating that iOS developers who sell through the App Store cannot sell their apps though any other means that are meant to reach iOS device consumers. Each of these instances of exclusionary conduct is also directly exclusionary in the U.S. market for iOS app and in-app-product distribution services, or for retailing iOS apps, in-app products, or subscriptions, because they ensure that iOS app developers must use Apple's distribution services to reach iOS device owners.

182.     Apple's anti-competitive conduct has created a dangerous probability that it will achieve monopoly power in the U.S. market (or sub-market) for iOS app and in-app-product distribution services.

183.     Apple has a specific intent to achieve monopoly power in the U.S. market for iOS app and in-app-product distribution services, or for retailing iOS apps, in-app products, or subscriptions. Now, and if its unlawful restraints are not checked, Apple has a dangerous probably of success.

184.     Apple has the power to exclude competition in the U.S. market for iOS app and IAP distribution services, or for retailing iOS apps & IAP and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, in an attempt to monopolize that relevant market.

185.     Apple's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rivals in the U.S. market for iOS app and in-app-product distribution services, or for retailing iOS apps, in-app products, or subscriptions.

186.     Apple has behaved as alleged herein in an attempt to obtain a monopoly in the U.S. market for iOS app and IAP distribution services, or for retailing iOS apps and IAP with the effect being that competition is foreclosed and that consumer choice is gravely diminished. So is innovation. Additionally, Apple has abused its market power by charging supra-competitive 30% distribution fees and mandating minimum prices and end-in-$.99 pricing for iOS apps and in-app products.

187.     There is no business necessity or other pro-competitive justification for Apple's conduct. Apple's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality, and lowered output and consumer choice.

188.     Plaintiffs and the federal law class have been injured, and will continue to be injured, in their businesses and property as a result of Apple's conduct, including by way of overpaying for iOS app and IAP distribution services. Additionally, or alternatively, plaintiffs and the federal law class have suffered damages because they were underpaid by Apple as a result of the Apple's conduct as described herein.

189.     Plaintiffs and the federal law class also are entitled to injunctive relief to prevent Apple from persisting in its unlawful, inequitable, and unjustified behavior to their detriment, with such an injunction barring this anti-competitive conduct.

**COUNT III** (Sherman Act  § 2)

## DENIAL OF ESSENTIAL FACILITY IN THE iOS APP
## DISTRIBUTION MARKET

190.     Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

191.     Apple's conduct violates Section 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations". 15 U.S.C. § 2.

192.     The market for smartphone enhanced commerce and information flow transacted via the national internet backbone is a valid antitrust market.

193.     Apple holds monopoly power in the market for smartphone enhanced commerce and information flow transacted via the national internet backbone.

194.     Apple unlawfully maintains its monopoly power in the market for smartphone enhanced commerce and information flow transacted via the national internet backbone through its unlawful denial to Plaintiffs and other app developers of an essential facility—access to iOS userbase—which prevents them from competing in the market.

195.     Apple controls access to iOS userbase, which is essential to effective competition in the market for smartphone enhanced commerce and information flow transacted via the national internet backbone.

196.     App developers are unable to reasonably or practically duplicate the entire infrastructure for smartphone enhanced commerce and information flow transacted via the national internet backbone. Duplicating the entire internet and iPhone userbase is about as feasible as recreating a mountain — in reference to binding caselaw from *Aspen Skiing Co* (472 U.S. 585, 1985). On the other hand, it is technically feasible, and in fact practical, for Apple to provide iOS userbase access to Plaintiffs and other app developers,

and it would not interfere with or significantly inhibit Apple's ability to conduct its business.

197.     In fact, providing this access is exactly what Apple has done for forty years with the Mac product ecosystem, a popular and successful computing platform.

198.     Apple's denial of access to iOS has no legitimate business purpose, and serves only to assist Apple in maintaining its unlawful monopoly position in the increasingly critically important market.

199.     Through its denial of its essential facility, Apple maintains its monopoly power in the market.

200.     Apple's conduct affects a substantial volume of interstate as well as foreign commerce.

201.     Apple's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

202.     As an app developer, Plaintiffs have been harmed by Apple's anti-competitive conduct in a manner that the antitrust laws were intended to prevent. Plaintiffs have suffered and continue to suffer harm and irreparable injury, and such harm and injury will not abate until an injunction ending Apple's anti-competitive conduct issues.

203.     To prevent these ongoing harms, the Court should enjoin the anti- competitive conduct complained of herein.


## COUNT IV
## SHERMAN ACT §2

204.     Plaintiffs repeat and re-alleges each and every allegation contained herein as if fully stated under this count.

205.     Apple's conduct violates Section 2 of the Sherman Act, which prohibits "monopolization of any part of the trade of commerce among the several States, or with foreign nations. 15 U.S.C. Section 2

206.     The iOS App Store is an antitrust market as defined above. Alternatively, the market exists for smartphone enhanced commerce and information transactions over the national internet backbone.

207.     Apple unlawfully maintains its monopoly power in the iOS App Store through its unlawful denial of access to Plaintiff's apps through disallowment and/or app ranking suppression.

208.     Apple serves as a *de facto* access point to the national internet backbone, for consumers who have invested trillions in their smartphone hardware and tax money for the backbone itself. Apple's anticompetitive behavior prevents consumers and taxpayers from fully realizing the benefit of their investment though apps such as Coronavirus Reporter, Unnamed Apps #1-#5, and Class members. Apple likewise prevents developers from transacting with and innovating for these consumers.

209.     Apple could exert quality control and law enforcement via its App Store, without infringing upon the rights of the consumers, and the developers who serve them. Specifically, Apple could create an independent App Court that ensures due process. This App Court would act independently from Apple Management, and would reduce or eliminate the problem of favoritism and cronyism. Developers who have a grievance about excessive commissions harming their product, unreasonable disallowment, and other issues could be afforded due process through said App Court.

210.    Indeed, such an App Court would be a vast improvement over the corrupt, self-serving App Store management currently in place. Per US House findings, even Apple staff finds Apple's behavior breathtaking. Such is the experience of Plaintiffs, in their dealings with junior app store workers.

211.    Plaintiffs proposed said App Court to Apple in April 2021, and have not heard back. As explained to Apple, an Independent App Court would be the first law enforcement venue solely dedicated to application computer code.

212.    Disallowing Dr Roberts from offering his COVID bioinformatics app is not a reasonable right Apple has, particularly when it is part of a wider ban on all startup efforts to help with the pandemic. In fact, time has shown that Apple's contact tracing app was largely untenable in major markets including the United States, and the country and taxpayers would have benefitted from increased competition from COVID startups, such as Coronavirus Reporter. There existed no valid reason for Apple to block the Plaintiff's medical application, let alone every COVID startup in existence, from contributing to the public good. Apple did not have "superior expertise" or ability to "foretell COVID," even though it acted like it did.

213.    Not only does Apple prevent developers from selling their product to Apple customers through the App Store they control; Apple produced their own contact-tracing software shortly after Coronavirus Reporter was disallowed. The control of a marketplace where Apple even competes calls for increased scrutiny to this alleged violation of the Sherman Act.

214.    The public and the taxpayer would have benefitted from the vast expertise of Roberts and his team, and other startups, to assist in the early days of COVID.

215.     As the creator of an app with temporarily limited commercial liability, Coronavirus Reporter was harmed by Apple's anti-competitive conduct in a manner that the antitrust laws, and moreover recent COVID laws, were intended to prevent.

216.     Apple disallows applications in an arbitrary and capricious manner to benefit their own monopoly and their business and contract partners.

## COUNT V
## SHERMAN ACT §1 – UNREASONABLE RESTRAINT OF TRADE

217.     Plaintiffs repeat and re-allege each and every allegation contained herein as if fully stated under this count.

218.     Apple's conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade of commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

219.     The Apple Developer Program License Agreement and the terms of the App Store unreasonably restrain competition between Apple users of different states attempting to access the national and global internet backbone.

220.     Apple has induced and coerced developers, like the Plaintiffs and the class members, to sign and be bound by their illicit contracts. The contracts waive Plaintiffs' rights to access the iOS userbase, and allow Apple "carte blanche" to restrict or deny any app, favor competitors and cronies, and/or overcharge, or underpay.

221.     Apple's conduct and unlawful contractual restraints affects a substantial proportion of the population, approximately 60-80% of internet commerce and information exchange.

222.     Apple's conduct and ability to arbitrarily determine which applications will or will not be published has substantial anti-competitive effects, including here an outright bar disallowing any startup from assisting in the pandemic relief, via an app. Plaintiffs Coronavirus Reporter, and Unnamed App #1, and many other startups wishing to help were barred from doing so, because of Apple's illegal contracts.

223.     Competition amongst COVID startups may have indeed saved lives, better informed the public, and other intangible benefits.

224.     Under Apple's forced contracts and policies, countless independent developers have been injured in the same way described in this lawsuit. Apple frequently uses pretextual excuses like protecting consumers privacy rights, or from financial risk, to cherry pick the apps they want, that benefit themselves, their partners and cronies.

225.     Indeed, these pretextual excuses were applied to nearly every other Unnamed App in this complaint, and are well documented in the US House report (Exhibit B) and academic papers (See, Screen Time App controversy).

226.     The restraint in this case is even more severe than it may appear on face value because COVID applications like Plaintiffs' are only useful if they achieves a critical mass of users. Apple's disallowment prevented Coronavirus Reporter and Unnamed App #1 from realizing their full potential on any available marketplace. In other words, non-Apple users would have a product with reduced functionality, because of Apple's antitrust behavior.

227.     Apple's conduct caused Plaintiffs substantial injury. Non-startup, permitted apps from recognized institutions that were allowed in March 2020 obtained millions of

downloads and a top rank in the App Store, demonstrating the strong demand for COVID information applications at that time.

228.     Evidence is irrefutable that Apple green-lit an almost identical app, Zoe created by Guy St Thomas and Kings College London, and other later contributors.

229.     Ironically, after all of these years Apple forgot it was founded in the garage of two independent inventors, the legendary American entrepreneurs Steve Jobs and Steve Wozniak.   There was no good reason, decades later, for Apple to mandate that only institutions may contribute to the COVID emergency. This defies Apple's own means of creation. The public can choose which app authors they wish to use, and it is more than evident that Plaintiff's app, at a time when no other COVID apps existed, would have been downloaded by millions. Here, Apple unlawfully put its thumb on the scales, destroying any chance that Coronavirus Reporter and its fellow startups such as Unnamed App #1 had to participate in the open and free information exchange afforded by the internet. To prevent these harms, this Honorable Court shall permanently enjoin the aforementioned anti-competitive behavior.


**COUNT VI (Sherman Act § 1)**
**TYING THE APP STORE IN THE iOS DISTRIBUTION MARKET**
**TO THE IAP PROCESSING MARKET**

230.     Plaintiffs restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

231.     Apple's conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations".15 U.S.C. § 1.

232.    Through its Developer Agreement with app developers and its App Store Review
Guidelines, Apple has unlawfully tied its in-app payment processor, In- App Purchase, to
the use of its App Store.

233.    Apple has sufficient economic power in the tying market, the iOS App
Distribution Market, because the App Store is the sole means by which apps may be
distributed to consumers in that market.

234.    Apple is able to unlawfully condition access to the App Store on the developer's
use of a second product—In-App Purchase—for in-app sales of in-app content. Through
its Developer Agreement and unlawful policies, Apple expressly conditions the use of its
App Store on the use of its In-App Purchase to the exclusion of alternative solutions in a
*per se* unlawful tying arrangement.

235.    The tying product, Apple's App Store, is distinct from the tied product, Apple's
In-App Purchase, because app developers such as Plaintiff have alternative in-app
payment processing options and would prefer to choose among them independently of
how the developer's iOS apps are distributed. In other words, app developers are coerced
into using In-App Purchase by virtue of wanting to use the App Store. Apple's unlawful
tying arrangement thus ties two separate products that are in separate markets and coerces
Plaintiffs and other developers to rely on both of Apple's products.

236.    Apple's conduct has foreclosed, and continues to foreclose, competition in the
iOS In-App Payment Processing Market affecting a substantial volume of commerce in
these markets.

237.     Apple has thus engaged in a *per se* illegal tying arrangement and the Court does not need to engage in a detailed assessment of the anti-competitive effects of Apple's conduct or its purported justifications.

238.     In the alternative only, even if Apple's conduct does not constitute a *per se* illegal tie, an analysis of Apple's tying arrangement would demonstrate that this arrangement violates the rule of reason and is illegal by coercing developers into using its In-App Purchase product.

239.     Apple's conduct harms those Plaintiffs and class members which, as a direct result of Apple's anti- competitive conduct, are paying supra-competitive fees on in-app purchases processed through Apple's payment processor and have forgone revenue they would be able to generate if their own in-app payment processor were not unreasonably restricted from the market.

240.     As an app developer that consumes in-app payment processing services and as the developer of a competing in-app payment processing tool, certain Plaintiffs and class members have a direct financial interest in the iOS In-App Payment Processing Market and, in the alternative, in the iOS Games Payment Processing Market, and has been foreclosed from competing with Apple directly as a result of Apple's unlawful tie.

241.     Plaintiff has been harmed by Apple's anti-competitive conduct in a manner that the antitrust laws were intended to prevent. Plaintiff has suffered and continues to suffer harm and irreparable injury, and such harm and injury will not abate until an injunction ending Apple's anti-competitive conduct issues. To prevent these ongoing harms, the Court should enjoin the anti- competitive conduct complained of herein.

242.     Apple has attempted to monopolize the U.S. market for iOS app and IAP distribution services. Alternatively, Apple, as the sole U.S. retailer of iOS apps and IAP digital products, and, upon information and belief, a seller of a significant sum of in-app subscriptions, is an attempted monopsonist in the relevant market. More specifically, Apple has willfully acquired and maintained market power by its patently exclusionary conduct, including its refusal to allow iOS device owners to purchase iOS apps and IAP other than through its own App Store; refusing to allow other app stores to be allowed on its devices; and mandating that iOS developers who sell through the App Store cannot sell their apps though any other means that are meant to reach iOS device consumers. Each of these instances of exclusionary conduct is also directly exclusionary in the U.S. market for iOS app and in-app-product distribution services, or for retailing iOS apps, in-app products, or subscriptions, because they ensure that iOS app developers must use Apple's distribution services to reach iOS device owners.

243.     Apple's anti-competitive conduct has created a dangerous probability that it will achieve monopoly power in the U.S. market (or sub-market) for iOS app and in-app-product distribution services.

244.     Apple has a specific intent to achieve monopoly power in the U.S. market for iOS app and in-app-product distribution services, or for retailing iOS apps, in-app products, or subscriptions. Now, and if its unlawful restraints are not checked, Apple has a dangerous probably of success.

245.     Apple has the power to exclude competition in the U.S. market for iOS app and IAP distribution services, or for retailing iOS apps & IAP and it has used that power,

including by way of its unlawful practices in restraint of trade as described herein, in an attempt to monopolize that relevant market.

246.     Apple's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rivals in the U.S. market for iOS app and in-app-product distribution services, or for retailing iOS apps, in-app products, or subscriptions.

247.     Apple has behaved as alleged herein in an attempt to obtain a monopoly in the U.S. market for iOS app and IAP distribution services, or for retailing iOS apps and IAP with the effect being that competition is foreclosed and that consumer choice is gravely diminished. So is innovation. Additionally, Apple has abused its market power by charging supra-competitive 30% distribution fees and mandating minimum prices and end-in-$.99 pricing for iOS apps and in-app products.

248.     There is no business necessity or other pro-competitive justification for Apple's conduct. Apple's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality, and lowered output and consumer choice.

249.     Plaintiffs and the federal law class have been injured, and will continue to be injured, in their businesses and property as a result of Apple's conduct, including by way of overpaying for iOS app and IAP distribution services. Additionally, or alternatively, plaintiffs and the federal law class have suffered damages because they were underpaid by Apple as a result of the Apple's conduct as described herein.

250.     Plaintiffs and the federal law class also are entitled to injunctive relief to prevent Apple from persisting in its unlawful, inequitable, and unjustified behavior to their detriment, with such an injunction barring this anti-competitive conduct.

## COUNT VII
## BREACH OF CONTRACT

251.     Plaintiff and Defendant had entered into a contract, notwithstanding the aforementioned components whereby Plaintiff had no real choice as to the terms.

252.     Apple's Developer Agreement as amended in March 2020 promised that entities with "deeply rooted medical credentials" were permitted to publish COVID apps on the App Store.

253.     Dr Robert Roberts has deep rooted medical credentials.

254.      A startup is an entity, with credentials equal to or greater than the sum of the intrinsic and inherent credentials possessed by its founders. In other words, common sense dictates that a startup headed by Dr Roberts has at least the credentials of Dr Roberts. A startup logically cannot have less, or fewer, credentials that its founders. Hence, Plaintiff is a startup, or corporate entity with deep credentials.

255.     Plaintiff's small team of experts was comparable to the development team sizes of other apps Apple permitted to be published on the App Store. Namely, the Zoe Guys' St Thomas app was developed primarily by two scientists, and though they possessed impressive medical credentials, they did not have some sort of credential that would legally amount to "more deeply rooted" or unilaterally above and beyond Dr Roberts' expertise.

256.     Dr Robert Roberts extensive CV (Exhibit A) was provided to Apple leadership, documenting his deep rooted medical credentials.

257.     Apple willfully ignored Dr Roberts' credentials, and therefore, the deep-rooted credentials of his organization, Coronavirus Reporter.

258.     As Chief Medical Officer of Coronavirus Reporter, Dr Roberts had absolute authority over the medical app.

259.     As Dr Roberts noted in his CNBC interview, many inventions throughout the history of the industrial revolution and modern medicine were produced by "startup" entities comprised of one or two scientist inventors.

260.     As such, historic and reasonable interpretation of "deep rooted" credentials sufficient for important inventions supports a contract interpretation favorable to Plaintiff.

261.     Apple breached their own Developer Agreement when they refused to allow an entity with deep-rooted medical expertise to publish on the App Store.

262.     This refusal to publish directly caused the damages described in this Amended Complaint. Refusal to publish of Coronavirus Reported entailed blocking access to the national internet backbone.

263.     A baseline estimate of contractual losses assumes Coronavirus Reporter lost five million users/day over a two-year period, because rival apps with nearly identical functionality that launched months later easily obtained this milestone. Based on comparable analysis of COVID media channel revenue rates, spanning from television news networks providing COVID news (e.g. CNN) to websites to apps, Coronavirus Reporter would have generated no less than two hundred million dollars of income, had it been properly allowed. To the extent Plaintiff would have re-invested that income into COVID research, further accumulative losses to society are hereby alleged.

## COUNT VII
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

264.    In choosing to develop an app for Defendant's Apple iPhone, Plaintiff relied on the covenant of good faith and fair dealing.

265.    In every contract there is an implied covenant of good faith and fair dealing by each party not to do anything which will deprive the other parties of the benefits of the contract, and a breach of this covenant by failure to deal fairly or in good faith gives rise to an action for damages.

266.    Indeed, Apple breached the covenant when, during an international pandemic emergency, they disregarded established medical hierarchies and blocked Dr Roberts from using the internet to help people disseminate epidemiological data.

267.    Apple had been on a mission, for at least two years, to make their own mark in medicine, with Mr. Cook declaring Apple's greatest contribution to mankind would be in medicine.

268.    There was no good faith when Apple focused on their own success, and blocked a research professor such as Dr Roberts, who had saved countless lives through his lifelong dedication to the field of cardiology.

269.    Apple's breach of the covenant caused substantial damages to Plaintiff and well beyond, blocking Dr Roberts app from playing its role in the reduction of its potential to help reduce SARS-CoV-2 coronavirus transmission.


WHEREFORE, The Plaintiffs and class members respectfully request that this Honorable Court:

A. Certify this case as a developer class action lawsuit and that it certify the proposed federal law classes on a nationwide basis for all developers who were disallowed or subject to ranking suppression, or subject to excessive 30% rents and $99 annual

subscription fees. Allow prompt, expedited discovery to identify those developers who are members of the proposed class.

B. Order damages to lead Plaintiffs in excess of two hundred million dollars for Coronavirus Reporter, based on comparable analysis of similar coronavirus information media distribution channels, and in excess of three hundred million dollars for the Five Unnamed Plaintiffs, under the proper jurisdictional authority of this Court.

C. Award treble damages under Antitrust Law, and in light of the probable loss of life caused by Defendant Apple's anticompetitive behavior, which breathtakingly, and for the first time in history, disallowed startups from helping in a pandemic, amounting to USD $1.5 billion dollars.

D. Award damages to the developer class members for lost brand goodwill, lost revenue opportunities, anticompetitive annual subscription fees, and excessive rents.

E. In estimating the total damages amount for all Plaintiffs and class members, as noted in the US House report, Apple's excess developer fees alone could represent $10 billion over the past three years, before treble damages. Depending upon the number of plaintiffs, which is hereby sought in expedited discovery, total actual and punitive damages are estimated to exceed $25 billion USD at a minimum.

F. Issue a permanent injunction under the Sherman Act restraining Defendant's App Store from denying reasonable applications from access to the smartphone enhanced internet backbone; from denying developers due process in the app review process in the form of a newly created, independent, and impartial App Court, from implementing excessive rents through payment processing, and any and all other anticompetitive behavior the jury finds.

G.  Grant any further relief as may be fair and just.


Respectfully submitted, this 26th day of April 2021.

/s/ Keith Mathews
Keith Mathews
NH Bar No. 20997
Associated Attorneys of New England
PO Box 278
Manchester, NH 03105
Ph. 603-622-8100
keith@aaone.law


## CERTIFICATE OF SERVICE

I, Keith Mathews, do declare as follows:

I certify that a copy of the foregoing was delivered electronically to counsel for the Defendants with counsel, and emailed to those without known counsel.

Executed on this 26th day of April 2021.


/s/ Keith Mathews
Keith Mathews
Attorney for Plaintiff